DUANE MORRIS LLP
*A Delaware Limited Liability Partnership*
1540 Broadway
New York, NY 10036
(212) 692-1000
(212) 208-4521 (facsimile)
Rudolph J. DiMassa, Jr., Esq.
DiMassa@duanemorris.com
William C. Heuer, Esq.

STERN TANNENBAUM & BELL LLP
380 Lexington Avenue
New York, NY 10168
(212) 792-8484
(212) 792-8489 (facsimile)
David S. Tannenbaum
Francine Nisim
FNisim@sterntannenbaum.com
Rosemary Halligan
Attorneys for Empire State Building Company L.L.C.,
Empire State Building, Inc. and Empire State Building
Associates L.L.C.

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------x

| | | |
|---|---|---|
| IN RE: NEW YORK SKYLINE, INC., | : | Chapter 11 |
| | : | Case No. 09-10181 (SMB) |
| Debtor. | : | |

------------------------------------------------------------x

| | | |
|---|---|---|
| NEW YORK SKYLINE, INC., | : | |
| | : | Adversary Proceeding |
| Plaintiff, | : | Case No. 09-01145(SMB) |
| | : | |
| -against- | : | |
| | : | |
| EMPIRE STATE BUILDING COMPANY L.L.C., | : | **REPLY** |
| EMPIRE STATE BUILDING, INC. and | : | **MEMORANDUM OF LAW** |
| EMPIRE STATE BUILDING ASSOCIATES | : | |
| L.L.C. | : | |
| Defendants. | : | |

------------------------------------------------------------x

| | | |
|---|---|---|
| EMPIRE STATE BUILDING COMPANY L.L.C., | : | |
| and EMPIRE STATE BUILDING, INC., | : | |
| | : | |
| Plaintiffs, | : | |
| | : | Adversary Proceeding |
| -against- | : | Case No. 09-01107 (SMB) |
| | : | |
| NEW YORK SKYLINE, INC., | : | |
| | : | |
| Defendant. | : | |

------------------------------------------------------------x

# TABLE OF CONTENTS

Page No.

TABLE OF AUTHORITIES ...............................................................................ii

ARGUMENT ......................................................................................................1

    POINT I -    THIS COURT HAS SUBJECT MATTER JURISDICTION............1

    POINT II -    ESB SHOULD BE GRANTED SUMMARY JUDGMENT
                ON COUNT XI FOR ITS ATTORNEYS' FEES .............................10

    POINT III -    ESB IS ENTITLED TO SUMMARY JUDGMENT ON ITS
                SECOND COUNTERCLAIM TO ENJOIN SKYLINE
                FROM COMPENSATING ITS EMPLOYEES OR
                REPRESENTATIVES BASED ON SALES INCENTIVES ............16

    POINT IV -    ESB SHOULD BE GRANTED SUMMARY JUDGMENT
                DISMISSING SKYLINE'S FOURTEENTH CLAIM FOR
                RELIEF FOR BREACH OF THE COVENANT OF GOOD
                FAITH AND FAIR DEALING .......................................................22

    POINT V -    ESB SHOULD BE GRANTED SUMMARY JUDGMENT
                DISMISSING SKYLINE'S FIFTEENTH CLAIM FOR
                RELIEF FOR PRIMA FACIE TORT...............................................24

    POINT VI -    ESB SHOULD BE GRANTED SUMMARY JUDGMENT
                DISMISSING SKYLINE'S EIGHTEENTH CLAIM FOR
                RELIEF FOR TORTIOUS INTERFERENCE WITH
                CONTRACT ...................................................................................33

CONCLUSION....................................................................................................37

# TABLE OF AUTHORITES

**Cases**

**Page No.**

815 Park Ave. Owners, Inc. v. Metzger, 250 A.D.2d 471 (1st Dep't 1998) ................................. 15

930 Fifth Corp. v. King, 42 N.Y.2d 886, 366 N.E.2d 875 (1977) ................................................ 15

936 Second Ave. L.P. v. Second Corporate Dev. Co., Inc.,
    37 A.D.3d 190, 830 N.Y.S.2d 59 (1st Dep't 2007) .................................................................... 13

Acquista v. N.Y. Life Ins. Co., 285 A.D.2d 73 (1st Dep't 2001.) .................................................. 23

Allerand, LLC v. 233 E. 18th St. Co., L.L.C.,
    19 A.D.3d 275 , 798 N.Y.S.2d 399 (1st Dep't 2005) ........................................................... 13, 14

Altieri v. Net Realty Holding Trust,
    237 A.D.2d 551, 655 N.Y.S.2d 984 (2d Dep't 1997) ................................................................ 14

Bastys v. Rothschild, 154 Fed. Appx. 260 (2d Cir. 2005) ............................................................ 32

Ben Cooper, Inc. v. Ins. Co., of Pennsylvania (In re Ben Cooper, Inc.),
    896 F.2d 1394 (2d Cir. 1990) ....................................................................................................... 5

Bi-Economy Mkt., Inc. v. Harleysville Ins. Co. of N.Y.,
    10 N.Y.3d 187, 886 N.E.2d 127 (2008) ..................................................................................... 23

Brazier v. Hasbro, Inc., 2004 WL 1497607 (S.D.N.Y. July 6, 2004) ........................................... 32

Burns Jackson Miller Summit & Spitzer v. Lindner,
    59 N.Y.2d 314 , 451 N.E.2d 459 (1983) .................................................................................... 27

Chock 336 Broadway Operating, Inc. v. Comanche Props., Inc.,
    163 A.D.2d 36, 558 N.Y.S.2d 503 (1st Dep't 1990) ................................................................. 18

Cohen's W. 14th St. Corp. v. Parker 14th Assocs.,
    125 A.D.2d 249, 509 N.Y.S.2d 340 (1st Dep't 1986) ............................................................... 27

Colina v. One E. River Place Realty Co., LLC,
    2000 WL 1171126 (S.D.N.Y. Aug. 17, 2000) ............................................................................ 27

Crucey-Castillo v. U.S., 2009 WL 564287 (S.D.N.Y. March 5, 2009) ......................................... 32

Daniels v. St. Luke's-Roosevelt Hosp. Ctr., 2003 WL 22410623 (S.D.N.Y. Oct. 21, 2003) ...... 37

*Duane Reade v. 405 Lexington, LLC*, 5 Misc.3d 1030(A) (N.Y. Sup. Ct. 2004)...................13

*Duane Reade v. Highpoint Assocs. IX, LLC*, 36 A.D.3d 496,
829 N.Y.S.2d 454 (1st Dep't 2007)........................................................ 11

*Duane Reade v. York Towers, Inc.*, 22 A.D.3d 246, 802 N.Y.S.2d 401 (1st Dep't 2005) ........... 14

*E. 55th St. Joint Venture v. Litchman*, 126 Misc.2d 1049, 487 N.Y.S.2d 256 (1st Dep't 1984).. 13

*Eskimo Pie Corp. v. Whitelawn Dairies, Inc.*, 284 F.Supp. 987 (S.D.N.Y. 1968) ....................... 22

*Evans v. Famous Music Corp.*, 1 N.Y.3d 452, 807 N.E.2d 869 (2004) ......................................... 21

*Fairchild Liq. Trust v. The State of New York (In re Fairchild Corp.)*,
452 B.R. 525 n.14 (Bankr. D. Del. 2011) ....................................................... 3

*Foster v. Churchill*, 87 N.Y.2d 750- , 665 N.E.2d 153 (1996) ...................................................... 36

*Fox Film Corp. v. Springer*, 273 N.Y. 434, 8 N.E.2d 23 (1937) .................................................. 22

*Frank B. Hall & Co. of N.Y. v. Orient Overseas Assoc.*,
84 A.D.2d 338, 446 N.Y.S.2d 59 (1st Dep't 1982) ..................................... 12

*General Media, Inc. v. Guccione (In re General Media, Inc.)*,
335 B.R. 66 (Bankr. S.D.N.Y. 2005) ...................................................... 7

*Genson v. Sixty Sutton Corp.*, 30 Misc.3d 145(A), 926 N.Y.S.2d 344
(App. Term. 1st Dep't 2011) ................................................................. 14

*Goldmark, Inc. v. Catlin Syndicate Ltd.*, 2011 WL 743568 (E.D.N.Y. Feb. 24, 2011) ............... 23

*Graev v. Graev*, 11 N.Y.3d 262, 898 N.E.2d 909 (2008) ............................................................. 21

*H.L. Klion, Inc. v. Venimore Bldg. Corp.*,
21 A.D.2d 673 , 249 N.Y.S.2d 910 (2d Dep't 1964)..................................................... 14

*Hantz v. Hillman Housing Corp.*, 2011 WL 2292586 (N.Y. Sup. Ct. 2011)................................. 15

*Harza Ne. v. Lehrer McGovern Bovis*, 255 A.D.2d 935 (4th Dep't 1998)..................................... 22

*Hollman v. County of Suffolk*, 2011 WL 2446428 (E.D.N.Y. June 15, 2011) ........................... 32

*Hudson Valley Props. & Rentals, Inc. v. Ursuline Provincialate, Eastern Province of the U.S., Inc.*, 221 A.D.2d 507, 633 N.Y.S.2d 592 (2d Dep't 1995) ........................................... 17

Huron Assocs., LLC v. 210 E. 86th St. Corp.,
    18 A.D.3d 231, 794 N.Y.S.2d 360 (1st Dep't 2005) ..................................... 12, 13, 14

IMG Fragrance Brands, LLC v. Houbigant, Inc., 679 F.Supp.2d 395 (S.D.N.Y.2009) ............... 36

In re Bearing Point, Inc.,
    Case No. 09-10691 (REG), 2011 WL 2709295 (Bankr. S.D.N.Y. July 11, 2011) ..................... 4

In re Kassover, 448 B.R. 625 (S.D.N.Y. 2011) ................................................................. 7

In re Pan Am. School of Travel, Inc., 47 B.R. 242 (Bankr. S.D.N.Y. 1985) ................. 7

In re Polaroid Corp., 451 B.R. 493 n. 6 (Bankr. D.Minn. 2011) ...................................... 3

In re Riverside Nursing Home, 137 B.R. 134 (Bankr. S.D.N.Y. 1992) ......................... 9

In re Westview 74th St. Drug Corp., 59 B.R. 747 (Bankr. S.D.N.Y. 1986).................................. 13

Integrated Sales v. Maxell Corp. of Am.,
    94 A.D.2d 221, 463 N.Y.S.2d 809 (1st Dep't 1983) ................................................... 22

Jaffe v. Paramount Commc'ns Inc.,
    222 A.D.2d 17, 644 N.Y.S.2d 43 (1st Dep't 1996) ................................................... 23

Joremi Enters., Inc. v. Hershkowitz (In re New 118th LLC),
    396 B.R. 885 (Bankr. S.D.N.Y. 2008) ........................................................................ 6

Matsumura v. Benihana Nat'l Corp., 2010 WL 882968 (S.D.N.Y. March 5, 2010) ................... 18

McCarthy v. Am. Int'l Group, Inc., 283 F.3d 121 (2d Cir. 2002)...................................…..21

Mg Refining & Marketing, Inc. v. Knight Enters., Inc., 25 F.Supp.2d 175 (S.D.N.Y. 1998)...... 22

N. Pipeline Constr. Co. v. Marathon Pipe Line Co., 458 U.S. 50 (1982)........................................ 5

Nationwide Tarps, Inc. v. Midwest Canvas Corp., 228 F.Supp.2d 202 (N.D.N.Y. 2002) ........... 27

Neptune World Wide Moving, Inc. v. Schneider Moving & Storage Co. (In re Neptune World
    Wide Moving, Inc.), 111 B.R. 457 (Bankr. S.D.N.Y. 1990) ....................................... 7

Nowak v. Ironworkers Local 6 Pension Fund, 81 F.3d 1182 (2d Cir. 1996) ............................... 17

O'Connell v. 1205-15 First Ave. Assoc., LLC,
    28 A.D.3d 233, 813 N.Y.S.2d 378 (1st Dep't 2006) .................................................... 15

O'Neil Supply Co. v. Petroleum Heat & Power Co., 280 N.Y. 50, 19 N.E.2d 676 ...................... 22

Orion Pictures Corp. v. Showtime Networks, Inc. (In re Orion Pictures Corp.),
    4 F.3d 1095 (2d Cir. 1993)........................................................................................ 5

Palmieri v. Allstate Ins. Co., 445 F.3d 179 (2d Cir. 2006) ............................................ 17

Panasia Estates, Inc v. Hudson Ins. Co., 10 N.Y.3d 200 , 886 N.E.2d 135 (2008) ...................... 23

Park Ave. Radiologists, P.C. v. Melnick (In re Park Ave. Radiologists, P.C.),
    450 B.R. 461 (Bankr. S.D.N.Y. 2011)...................................................................... 7

Peterson v. 610 W. 142 Owners Corp. (In re 610 W. 142 Owners Corp.),
    219 B.R. 363 (Bankr. S.D.N.Y. 1998).............................................................. 3, 5, 13

Phoenix Ins. Co. v. APF Fire Protection, Inc.,
    2011 WL 2848183 fn. 4 (S.D.N.Y. April 7, 2011) ...................................................... 32

Picture People, Inc. v. Imaging Fin. Servs., Inc., 735 F. Supp. 2d 12 (S.D.N.Y. 2010) ........ 24, 27

Portside Growth & Opp. Fund v. Gigabeam Corp., 557 F.Supp.2d 427, 431, fn. 16
    (S.D.N.Y. 2008)…………………………………………………………………………….21

PSINet, Inc. v. Cisco Sys. Corp. (In re PSINet, Inc.),
    271 B.R. 1 (Bankr. S.D.N.Y. 2001)................................................................... 5, 6, 9

REP A8 LLC v. Aventura Techs., Inc.,
    68 A.D.3d 1087, 893 N.Y.S.2d 83 (2d Dep't 2009)................................................... 12

Revson v. Cinque & Cinque, P.C., 221 F.3d 59 (2d Cir. 2000)…………………………………21

Sayers v. Rochester Tel. Corp., 7 F.3d 1091 (2d Cir. 1993)........................................... 21

Seiden Assocs., Inc. v. ANC Holdings, Inc., 959 F.2d 425 (2d Cir. 1992) ............................ 22

Sheets v. Sheets, 22 A.D.2d 176, 254 N.Y.S.2d 320 (1st Dep't 1964) .............................. 22

Simon v. Unum Group, 2009 WL 2596618 (S.D.N.Y. Aug. 21, 2009) ............................... 23

Space Imaging Europe, Ltd. v. Space Imaging L.P., 38 F.Supp.2d 326 (S.D.N.Y. 1999) ........... 22

State of New York v. Home Indem. Co., 66 N.Y.2d 669, 486 N.E.2d 827 (1985) ................... 21

Sterling Vision, Inc. v. Sterling Optical Corp. (In re Sterling Optical Corp.),
    302 B.R. 792 (Bankr. S.D.N.Y. 2003).................................................................... 6

Stern v. Marshall, 131 S. Ct. 2594 (2011) ....................................................... 3, 4, 5, 8

Sun Mei Inc. v. Chen, 21 A.D.3d 265, 800 N.Y.S.2d 133 (1st Dep't 2005)........................... 12, 14

Sutton v. E. Riv. Sav. Bank, 55 N.Y.2d 550, 435 N.E. 1075 (1982)........................................... 22

Townsquare Media, Inc., Case No. 10-3017, 2011 WL 2906162 (7th Cir. 2011) ........................ 6

Truelove v. Ne. Capital & Advisory, 95 N.Y.2d 220, 738 N.E.2d 770 (2000) ........................... 17

Trump-Equitable Fifth Ave. Co. v. H.R.H. Constr. Corp.,
    106 A.D.2d 242, 485 N.Y.S.2d 65 (1st Dep't 1985).................................................... 22

Trusthouse Forte, Inc. v. 795 Fifth Ave. Corp.,
    1985 WL 1425 (S.D.N.Y. May 28, 1985) ............................................................... 12

U.S. ex rel. Evergreen Pipeline Constr. Co. v. Merritt Meridian Constr. Corp.,
    95 F.3d 153 (2d Cir. 1996)..................................................................................... 31

Vigoda v. DCA Prods. Plus Inc., 293 A.D.2d 265, 741 N.Y.S.2d 20 (1st Dep't 2002)............... 31

Walk-In Medical Centers, Inc v. Breuer Capital Corp., 818 F.2d 260 (2d Cir. 1987) ................. 22

W.W.W. Assoc. v. Gianconteri, 77 N.Y.2d 157, 163 (1990).....................................20, 21

## Statutes

11 U.S.C. § 1141 .................................................................................................................. 7, 9

18 U.S.C. § 1334 .................................................................................................................... 9

28 U.S.C. § 157.................................................................................................. 2, 4, 5, 8, 9

28 U.S.C. § 1334 ................................................................................................................ 2, 3

N.Y. Labor Law § 190 (1) ................................................................................................... 17

## Rules

Fed. R. Bankr. P. 7056 ........................................................................................................... 1

Fed. R. Civ. P. 26(a)(2)(A) ................................................................................................... 32

Fed. R. Civ. P. 37(c)(1)......................................................................................................... 32

Fed. R. Civ. P. 56 ................................................................................................................... 1

**REPLY MEMORANDUM OF LAW OF EMPIRE STATE BUILDING COMPANY
L.L.C., EMPIRE STATE BUILDING, INC., AND EMPIRE STATE BUILDING
ASSOCIATES L.L.C. IN FURTHER SUPPORT OF THEIR MOTION FOR SUMMARY
JUDGMENT ON COUNT XI OF THEIR COMPLAINT, ON THEIR SECOND
COUNTERCLAIM, AND DISMISSING NEW YORK SKYLINE, INC.'S FOURTEENTH,
FIFTEENTH AND EIGHTEENTH CLAIMS FOR RELIEF IN THEIR ENTIRETY**

Empire State Building Company L.L.C. ("ESBC"), Empire State Building, Inc. ("ESBI"

and sometimes together with ESBC, "ESB") and Empire State Building Associates L.L.C.

("ESBA")[1], respectfully submit this reply memorandum of law and the accompanying Reply

Affidavit of Rosemary Halligan ("Halligan Reply Aff.") in further support of their motion,

pursuant to Fed. R. Bankr. P. 7056 and Fed. R. Civ. P. 56 and pursuant to the Order of the Court

issued at the June 16, 2011 pre-trial hearing: (a) for summary judgment in favor of ESB on the

issue of liability on Count XI of the ESB Complaint seeking attorneys' fees; (b) granting ESB

partial summary judgment on its Second Counterclaim in the Skyline Proceeding, seeking an

injunction prohibiting Skyline from compensating its employees and representatives on a

prohibited basis; and (c) dismissing in their entirety, with prejudice, Skyline's Fourteenth,

Fifteenth and Eighteenth Claims for Relief, seeking damages for breach of the covenant of good

faith and fair dealing, prima facie tort, and tortious interference with contract, respectively, as set

forth in Skyline's Complaint.

## ARGUMENT

## POINT I

## THIS COURT HAS SUBJECT MATTER JURISDICTION

**A.      Subject Matter Jurisdiction is Present and Reconsideration Should be Denied**

Skyline argues that subject matter jurisdiction is not present. Skyline's arguments are

flawed and should be rejected. Skyline also asks that the Court reconsider its prior denial of

---

[1] The balance of the defined terms have the same meanings as set forth in ESB and ESBA's moving papers.

Skyline's request for remand of the Skyline Proceeding. The order denying remand is more than two years old, and Skyline's request should be denied.

## 1. The Statutory Framework for Bankruptcy Jurisdiction

Bankruptcy jurisdiction is established in 28 U.S.C. § 1334. The statute confers upon the United States district courts (i) original and exclusive jurisdiction over bankruptcy cases and (ii) original but not exclusive jurisdiction over "all civil proceedings arising under title 11, or arising in or related to cases under title 11." 28 U.S.C. §§ 1334 (a), (b). Once subject matter jurisdiction is established, procedures come into play. 28 U.S.C. § 157(a) permits the referral by district courts to bankruptcy courts in the same district of all (i) bankruptcy cases and (ii) matters arising under, arising in or related to cases under title 11. There is a standing order of referral in place in this district. See General Order 61, dated July 10, 1984 (Ward, D.J.).

Although Skyline argues that the Court lacks subject matter jurisdiction, Skyline neither cites nor analyzes either of the relevant jurisdictional statutes: 28 U.S.C. §§ 1334(a) or (b).

The claims at issue in the Skyline Proceeding and ESB Proceeding (the "Adversary Proceedings") satisfy the statutory requirements for subject matter jurisdiction. At the most basic level, the Adversary Proceedings will determine ESB's pending claims and counterclaims against the estate because ESB filed claims against the estate based upon the causes of action alleged in the Adversary Proceedings.[2] With respect to the claims asserted by Skyline, some of those claims will be resolved as part of resolving ESB's claims and counterclaims against the estate, and others may fall within the scope of "related to" jurisdiction.[3] Although recoveries

---

[2] Skyline's arguments ignore the fact that there are claims and counterclaims that ESB has asserted against Skyline that remain pending. See Claim Register (Case No. 09-10181) at Claim Nos. 5-1, 5-2 (amended), 6-1 and 6-2 (amended). By virtue of Skyline's bankruptcy filing, ESB was required to assert those claims in this Court, and did so both through the Adversary Proceedings and through the submission of proofs of claim.

[3] Skyline's claims for prima facie tort (fifteenth cause of action) and tortious interference (eighteenth cause of action) may be resolved in full by findings that ESB has not breached the lease or license agreements. Indeed, in its

may inure to the benefit of the reorganized Skyline, that, alone, is not determinative of the jurisdictional analysis. The claims asserted relate to contracts that were assumed in the Chapter 11 case. They are asserted as defenses or counterclaims to ESB's claims and were pending before confirmation. The claims are subject to a retention of jurisdiction provision in Skyline's confirmed plan. The fact that time has passed does not mean that jurisdiction is not present.

Because the statutory requirements for bankruptcy jurisdiction are met, Skyline's arguments should be rejected.

### 2. Stern v. Marshall

In arguing that subject matter jurisdiction is not present, Skyline points to Stern v. Marshall, 131 S. Ct. 2594 (2011). Stern v. Marshall, however, does not address subject matter jurisdiction. See generally In re Polaroid Corp., 451 B.R. 493, 495 n. 6 (Bankr. D.Minn. 2011) ("As Stern v. Marshall emphasizes, this is not a matter of jurisdiction.... Bankruptcy jurisdiction reposes in the United States District Court, under 28 U.S.C. § 1334(a)."); Fairchild Liq. Trust v. The State of New York (In re Fairchild Corp.), 452 B.R. 525, 530 n.14 (Bankr. D. Del. 2011) ("As an aside, the Supreme Court's recent opinion in Stern v. Marshall [is] inapplicable here. The issue in Stern v. Marshall was when, under the United States Constitution, the bankruptcy court could enter a final judgment as opposed to proposed findings of fact and conclusions of law in a case where subject matter jurisdiction existed under 28 U.S.C. § 1334(a). As such, Stern v.

Answer to the Complaint in the ESB Proceeding, Skyline's First Affirmative Defense incorporates almost all of the allegations made by Skyline in the Skyline Proceeding. To the extent Skyline's claims are fully resolved on that basis – being resolvable as part of or as defenses to ESB's claims – under Stern v. Marshall, "core" jurisdiction is present and the Court can enter judgments on those claims even if they would otherwise only qualify as non-core matters. See Stern v. Marshall, 131 S. Ct. 2594, 2620 (2011) (". . . lacked the constitutional authority to enter a final judgment on a state law counterclaim that is not resolved in the process of ruling on a creditor's proof of claim."). (emphasis supplied). Even to the extent the claims are not fully resolved as part of ESB's claims and counterclaims, jurisdiction is present as "related to" matters; the only difference being that, absent consent, the Court may only submit proposed findings and conclusions for review by the district court, rather than enter final judgment. Here, consent was given. See Point I.A.4, infra. Separately, where some claims are core and others are non-core, the Court must undertake a claim-by-claim analysis to determine the extent to which final orders can be entered. See Peterson v. 610 W. 142 Owners Corp. (In re 610 W. 142 Owners Corp.), 219 B.R. 363, (Bankr. S.D.N.Y. 1998) (claim by claim analysis).

Marshall is not a case about subject matter jurisdiction. Rather it addresses the power of the bankruptcy court to enter final orders, assuming that subject matter jurisdiction exists.") (citations omitted); In re Bearing Point, Inc., Case No. 09-10691 (REG), 2011 WL 2709295, at *1 (Bankr. S.D.N.Y. July 11, 2011). Skyline's arguments to the contrary should be rejected.

Stern addressed the extent to which bankruptcy courts can exercise the judicial power of the United States by entering final orders and judgments. The issue in Stern arose out of the fact that 28 U.S.C. § 157 establishes two different basic categories of matters in bankruptcy cases: (i) "core" and (ii) "non-core". See 28 U.S.C. §§ 157(b)(1), (c)(1); Stern, 131 S.Ct. at 2603-04. For "core" bankruptcy matters, bankruptcy courts may exercise the full judicial power and may enter final judgments subject to review on appeal. 28 U.S.C. § 157(b)(1); Stern, 131 S.Ct. at 2603-04. For "non-core" matters, absent consent, bankruptcy courts may not exercise the full judicial power and may only enter proposed findings of fact and conclusions of law, which are to be reviewed by the district court de novo; for non-core matters, it is the district court that enters final orders. 28 U.S.C. § 157(c)(1); Stern, 131 S.Ct. at 2604. The distinction is made clear in the statutory text itself through use of the phrase "hear and determine" (i.e., exercise the full judicial power and enter final judgments) for "core" matters, whereas the term "hear," alone, is used to describe the power of bankruptcy courts to rule in non-core matters (i.e., submit proposed findings of fact and conclusions of law subject to de novo review by the district court). Compare 28 U.S.C. §§ 157(b)(1) with (c)(1) (emphasis supplied).

Viewed alongside the statutory framework at the heart of Stern, it is clear that Skyline's statement that "Stern v. Marshall has clarified some of the rules governing Bankruptcy Court litigation that apply here, most particularly its lack of jurisdiction over traditional common law claims based solely on state law" is based upon a flawed reading or misunderstanding of the

case.  See Skyline Brief at p. 15 (emphasis supplied).  Indeed, even the suggestion that Stern v. Marshall broke new ground is flawed, being that (i) the decision is grounded in the principles set out nearly thirty (30) years ago in N. Pipeline Constr. Co. v. Marathon Pipe Line Co., 458 U.S. 50 (1982), and (ii) the analysis applied by the Supreme Court to 28 U.S.C. § 157(b)(2)(C) is the functional equivalent of the analysis that courts in the Second Circuit have applied to other subsections of 28 U.S.C. § 157(b)(2) for quite some time, see, e.g., Orion Pictures Corp. v. Showtime Networks, Inc. (In re Orion Pictures Corp.), 4 F.3d 1095, 1102-03 (2d Cir. 1993) (construing 28 U.S.C. § 157(b)(2)(A) as being limited by Marathon); Ben Cooper, Inc. v. Ins. Co. of Pennsylvania (In re Ben Cooper, Inc.), 896 F.2d 1394, 1397-99 (2d Cir. 1990) (same); PSINet, Inc. v. Cisco Sys. Corp. (In re PSINet, Inc.), 271 B.R. 1, 19-20 (Bankr. S.D.N.Y. 2001) (discussing 28 U.S.C. § 157(b)(2)(O)); Peterson v. 610 W. 142 Owners Corp. (In re 610 W. 142 Owners Corp.), 219 B.R. 363, 372 (Bankr. S.D.N.Y. 1998) (same).

In one important respect, however, Stern v. Marshall is applicable here:  the Supreme Court's analysis demonstrates that Skyline's claims can be resolved by this Court by entry of a final order because Skyline's claims against ESB can be fully resolved as part of the allowance or disallowance of ESB's claims against the estate.  Skyline admits as much in paragraph 158 of its answer to the ESB Complaint.  See Docket No. 10 (Case No. 09-01107) at ¶ 158 (First Affirmative Defense) (referencing nearly all allegations from the Skyline Proceeding (Docket No. 5 (Second Amended Complaint) in 09-01145)).  Any ruling on ESB's claims necessarily brings with it a ruling on Skyline's affirmative defenses thereto.  As such, under Stern v. Marshall, the Court can enter a final order resolving or disposing of Skyline's remaining claims.

### 3.    **Post-Confirmation Jurisdiction**

Mixed in with its Stern v. Marshall discussion, Skyline argues that subject matter jurisdiction is not present because time has passed and we are now in the post confirmation period. This argument, too, should be rejected.

Skyline's argument begins with the statement that "[l]ooking at the pending cases now, there simply is no Federal Court subject matter jurisdiction." See Skyline Brief at p. 15 (emphasis supplied). With respect to the removed Skyline complaint, the relevant time frame for analysis is the point in time at which the complaint was removed, not today. See Joremi Enters., Inc. v. Hershkowitz (In re New 118th LLC), 396 B.R. 885, 890 (Bankr. S.D.N.Y. 2008) (Bernstein, J.) ("Subject matter jurisdiction over a removed claim is determined by the facts existing at the time of removal"). With respect to the ESB Proceeding, jurisdiction is determined by reference to the time when the complaint was filed. See Sterling Vision, Inc. v. Sterling Optical Corp. (In re Sterling Optical Corp.), 302 B.R. 792, 802-03 (Bankr. S.D.N.Y. 2003). The jurisdictional analysis is not altered by subsequent events. Id.

The cases cited by Skyline make clear that Skyline's attempt to re-write the jurisdictional analysis is flawed. The facts of those cases make the point. Consistent with the general principles noted above regarding the focus (with respect to timing) of a jurisdictional analysis, questions relating to post confirmation jurisdiction relate to lawsuits or adversary proceedings that are commenced in the post confirmation period. Indeed, each and every one of the cases cited by Skyline involves an action that was commenced post confirmation. See Skyline Brief at pp. 15-16, citing: Townsquare Media, Inc., Case No. 10-3017, 2011 WL 2906162, at *2-4 (7th Cir. 2011) (plan was confirmed in 2003 and it was not until "[y]ears later" that litigation was commenced and even then, two amended complaints were thereafter filed, and the court found

that bankruptcy jurisdiction was lacking over the second amended complaint (that had abandoned all plan and bankruptcy case-related causes of action) -- "The bankruptcy judge ruled that, as thus amended, Brill's complaint was unrelated to the bankruptcy and that the bankruptcy court lacked jurisdiction over it"); In re Kassover, 448 B.R. 625, 627-29 (S.D.N.Y. 2011) (plan confirmed in June of 2000 and litigation commenced in July of 2005); General Media, Inc. v. Guccione (In re General Media, Inc.), 335 B.R. 66, 68, 71 (Bankr. S.D.N.Y. 2005) (Bernstein, J.) (plan confirmed on August 13, 2004 and litigation commenced on August 30, 2005); In re Pan Am. School of Travel, Inc., 47 B.R. 242, 244 (Bankr. S.D.N.Y. 1985) ("what is at issue in Pan Am's lawsuit is not an attempt to collect a pre-petition debt but the propriety of an injunction barring further alleged infringement and unfair competition by a debtor whose plan has been confirmed and who thus has rejoined the real world of post-reorganization life").

Here, the Adversary Proceedings have been pending before the Court for several years. Skyline's confirmed Chapter 11 plan expressly reserved jurisdiction over the Adversary Proceedings, and those proceedings will determine timely and properly-filed claims against the estate relating to a contract that was assumed by Skyline. The Court continues to have jurisdiction over the Adversary Proceedings even in the post confirmation context. See Neptune World Wide Moving, Inc. v. Schneider Moving & Storage Co. (In re Neptune World Wide Moving, Inc.), 111 B.R. 457, 462-64 (Bankr. S.D.N.Y. 1990) (11 U.S.C. § 1141(b) permits the retention of jurisdiction over actions pending at the time of confirmation); see also Park Ave. Radiologists, P.C. v. Melnick (In re Park Ave. Radiologists, P.C.), 450 B.R. 461, 467-68 (Bankr. S.D.N.Y. 2011) (discussing 11 U.S.C. § 1141(b) and In re Neptune World Wide Moving, Inc., supra).

### 4.   **Skyline Has Consented to Entry of Judgment in Any Non-Core Matters**

Skyline emphasizes in its Brief that, several years ago, it opposed ESB's removal of litigation from state court to this Court, and that at the same time it contended that the matters asserted in the Adversary Proceedings were non-core. That is correct, but what happened several years ago is no longer relevant to consideration of whether consent has been given for this Court to enter a final judgment in the Adversary Proceedings. Indeed, since that time, Skyline has given its <u>express</u> consent for this Court to enter final orders in the Adversary Proceedings, and Skyline should not be permitted to change course at this late stage. Thus, to the extent the Court finds that any of the claims asserted in the Adversary Proceedings are non-core and not resolvable as part of ESB's claims, both Skyline and ESB have consented to the entry of final judgment by the Court.

The statute expressly provides the Court with authority to enter final judgments even in non-core matters when the parties consent to the entry of final judgment. <u>See</u> 28 U.S.C. § 157(c)(2). <u>Stern v. Marshall</u> does not change the analysis – indeed, in explaining the statutory framework, the Supreme Court cited to and described § 157(c)(2) as permitting the entry of final judgments in non-core cases with consent of the parties. <u>See</u> <u>Stern</u>, 131 S. Ct. at 2607. Here, Skyline expressly consented to the entry of final judgments in the Adversary Proceedings.

On October 12, 2010, the Court entered an order confirming Skyline's Fourth Amended Plan of Reorganization (the "Plan"). <u>See</u> Docket No. 144 (Case No. 09-10181) (Order); <u>see also</u> Docket No. 132 (Case No. 09-10181) (Plan). Article 11 of the Plan provides for a retention of jurisdiction over various matters. Notably, the language used in Article 11 of the Plan tracks the statutory language used in 28 U.S.C. §§ 157(b)(1) and (c)(1): the Plan uses bankruptcy terms of art regarding the Court's authority to "hear" and to "determine" certain matters. <u>See generally</u>

Plan at Art. 11. As explained above, the authority to "hear" a matter, alone, relates to non-core matters for which bankruptcy courts may present proposed findings of fact and conclusions of law for de novo review by the district court. See Point I.A.1, supra. The authority to "determine" a matter relates to core matters or matters for which consent has been given, for which bankruptcy courts may enter final orders. See id. The Plan expressly provides that the Court retained jurisdiction to "determine any and all adversary proceedings, applications and contested matters that are pending on the Effective Date." Plan at 11.1(b) (emphasis supplied); see also id. at (c) (proofs of claim), (i) ("determine all Claims, controversies, suits and disputes against the Debtor to the full extent permitted under [sic] 18 U.S.C. § 1334 and 28 U.S.C. § 157."), (j) ("determine and enforce all Claims and causes of action which may exist on behalf of the Debtor or the Debtor's estate").[4] The Adversary Proceedings were pending on the Effective Date. The Plan also provided a retention of jurisdiction to "determine . . . the allowance of Claims and Administrative Expenses resulting [from the assumption of contracts]." Id. at 11.1(a) (emphasis supplied); see also id. at (c), (i). ESB's claims relate to the Lease and License Agreements, which were assumed by Skyline.

Skyline is bound by the terms of its confirmed Plan. 11 U.S.C. § 1141; see also In re Riverside Nursing Home, 137 B.R. 134, 137 (Bankr. S.D.N.Y. 1992) ("[The debtor] is bound by the terms of the confirmed Chapter 11 plan in accordance with 11 U.S.C. § 1141(a) and may not now challenge any portion of the plan"). In the Plan, Skyline used bankruptcy terms of art – to "determine" – and consented to the entry of a final judgment by this Court in the Adversary Proceedings. Skyline cannot now run from those commitments in a transparent attempt at forum-shopping. Thus, even if the Court were to determine that claims asserted in the Adversary Proceeding were non-core, it can enter a final judgment on those claims.

---

[4] The Disclosure Statement is Consistent with the Plan. See Docket No. 133 (Case No. 09-10181) at ¶ 55.

### 5. Remand Should Not be Granted in Any Event

In its jurisdictional argument, Skyline asks that the Court reconsider its prior ruling in which it denied remand of Skyline's prepetition action against ESB (and, presumably, the Court's denial of Skyline's request for abstention in ESB's post petition adversary proceeding). Those orders were entered years ago, and there is no basis for reconsideration.

If the Court construes Skyline's argument to contain a new request for remand and abstention, the request should be denied. The Adversary Proceedings address the last remaining claims against Skyline's estate. Skyline ignores this indisputable record fact. The Court has had these matters pending before it for years, and has already granted partial summary judgment in published decisions. All pre-trial matters have been completed and were overseen by the Court, and summary judgment briefing is complete on many of the last remaining claims among the parties. Remand at this late stage – to the extent Skyline actually has sought it – should be denied.

## POINT II

### ESB SHOULD BE GRANTED SUMMARY JUDGMENT ON COUNT XI ON LIABILITY FOR ITS ATTORNEYS' FEES

In its moving papers, ESB amply demonstrated that it is entitled to summary judgment on Count XI of its Complaint, seeking to establish Skyline's liability for the attorneys' fees ESB incurred in seeking to enforce all of the provisions of the Lease and License.[5]

The Lease and License are clear and unambiguous. If Skyline defaults under the Lease and/or License, and ESB institutes an action against Skyline based upon such default, then Skyline is responsible for the attorneys' fees incurred by ESB. (Halligan Aff. Ex. F, Article 5;

---

[5] As set forth in its moving papers, ESB respectfully requests that this Court grant ESB judgment on Skyline's liability to ESB for attorneys' fees, with the amount of such fees to be determined at a hearing.

Halligan Aff. Ex. G, Article 11.) Ironically, Skyline cites case law conceding that "legal fee clauses must be strictly construed" (see, e.g. Duane Reade v. Highpoint Assocs. IX, LLC, 36 A.D.3d 496, 829 N.Y.S.2d 454 (1st Dep't 2007)), while missing the simple and logical conclusion that strict construction of the plain, unambiguous language of the Lease and License requires Skyline to pay ESB's attorneys' fees. Despite this, Skyline advances several arguments against such a result, none of which can withstand any scrutiny, and none of which are supported by the language in the Lease and License, or the law.

First, Skyline contends that ESB cannot recover attorneys' fees because all of its claims in the ESB Proceeding have been dismissed. Skyline fails to acknowledge, however, that such claims only were dismissed because Skyline eventually cured its flagrant defaults, and/or agreed to cure such defaults by Stipulation. (See Halligan Aff. Ex. O.) Under those circumstances, ESB clearly is entitled to its fees.

Second, Skyline seeks to inject into the language of the Lease and License an additional requirement that for ESB to recover its fees, it would have had to seek to re-enter the Premises or dispossess Skyline. This purported condition, however, is not contained in the Lease or the License. Rather, Skyline invents this condition because the attorneys' fee provision is contained in the article of the Lease entitled "RELETTING, ETC." This article heading, however, does not limit the provisions contained therein. In fact, Article 40 of the Lease expressly states that "[t]he captions herein are inserted only for convenience, and are in no way to be construed as a part of this lease or as a limitation of the scope of any provision of this lease." (Halligan Aff. Ex. F, Article. 40.)

In any event, a reading of Article 5 makes clear that the attorneys' fees provision is part of the "ETC." part of the heading. Skyline seeks to distort such a reading of Article 5 by

disingenuously quoting selective phrases from different sentences in a wrongful attempt to give it new meaning. (See Skyline's Memorandum of Law in opposition to ESB's motion for summary judgment ("Opp. Br.") p. 23, fn 7.) Specifically, the first phrase quoted by Skyline, that "lessor may deduct all expenses incurred in obtaining possession or re-letting the premises, including legal expenses, attorneys' fees..." is contained in the middle of the first paragraph, and the language relied on by ESB above, on the other hand, is the last full sentence of the second paragraph. (Halligan Aff. Ex. F, Article 5.) Thus, these two provisions are clearly not inter-related, as Skyline would lead the Court to believe.

Further, the cases cited by Skyline in support of its argument all contain entirely different attorneys' fees provisions. See, e.g. Trusthouse Forte, Inc. v. 795 Fifth Ave. Corp., 1985 WL 1425, at *3 (S.D.N.Y. May 28, 1985) (attorneys' fees clause provided "[i]n case of any re-entry by Lessor under the terms of this lease or upon such termination thereof or any dispossession of Lessee...the rent shall become due and be paid up...together with such reasonable expenses as Lessor may incur for attorneys' fees..."); Frank B. Hall & Co. of N.Y. v. Orient Overseas Assoc., 84 A.D.2d 338, 341, 446 N.Y.S.2d 59 (1st Dep't 1982) (attorneys' fees clause provided "[i]n case of any such default, re-entry, expiration and/or dispossess by summary proceedings...the rent shall become due thereupon...together with such expenses as Landlord may incur for legal expenses [and] attorneys' fees...").

The cases cited by ESB in its moving brief -- some of which Skyline falsely summarizes and unsuccessfully tries to distinguish -- further demonstrate that Skyline's unsupported theory fails as a matter of law. See Huron Assocs., LLC v. 210 E. 86th St. Corp., 18 A.D.3d 231, 794 N.Y.S.2d 360 (1st Dep't 2005); REP A8 LLC v. Aventura Techs., Inc., 68 A.D.3d 1087, 893 N.Y.S.2d 83 (2d Dep't 2009); Sun Mei Inc. v. Chen, 21 A.D.3d 265, 266, 800 N.Y.S.2d 133, 134

(1st Dep't 2005). Many of the cases Skyline relies upon also demonstrate the ridiculousness of its theory, as in many cases, the Court actually awarded attorneys' fees under circumstances consistent with those here. See Duane Reade v. 405 Lexington, LLC, 5 Misc.3d 1030(A) (N.Y. Sup. Ct. 2004); In re Westview 74th St. Drug Corp., 59 B.R. 747 (Bankr. S.D.N.Y. 1986); Allerand, LLC v. 233 E. 18th St. Co., L.L.C., 19 A.D.3d 275, 277, 798 N.Y.S.2d 399 (1st Dep't 2005).

Third, Skyline seeks to distinguish the nature of its defaults from those in Huron Assocs., LLC, supra 18 A.D.3d 231 (denying landlord's access to the premises) and Allerand, LLC, supra, 19 A.D.3d 275, 277 (withholding rent) by claiming that attorneys' fees are only available where a tenant breaches a "basic obligation of the lease." While it should be evident that Skyline's violation of the use clause of the Lease, failure to cure F.D.N.Y. violations, improper compensation structures, improper advertising, and other flagrant defaults are breaches of "basic obligations" of the Lease and License, ESB need not prove that fact because neither the Lease nor the License condition an award of attorneys' fees based on a breach of a "basic obligation" thereof. Rather, ESB is entitled to recover attorneys' fees it incurs as a result of remedying any "default."[6] In any event, none of Skyline's cited cases offer any definition or analysis about what constitutes a "basic obligation of the lease" and are otherwise distinguishable from this case.[7]

---

[6] Skyline has never considered its own breaches of the Lease and License to be "material," apparently causing it to ignore many basic obligations of the Lease, including with respect to disclaimers, F.D.N.Y. violations, and other obligations of the Lease and License. (Halligan Reply Aff. Ex. I (Schulman 21:2-25).) Skyline instead focused only on what Skyline considered to be ESB's alleged breaches of those same agreements. (Id.) But Skyline cannot simply ignore its own obligations because no harm comes to it as a result, and expect not to have pay attorneys' fees incurred by ESB in having to seek court intervention to compel Skyline to comply with those obligations which, of course, obviously harmed ESB.

[7] See 936 Second Ave. L.P. v. Second Corporate Dev. Co., Inc., 37 A.D.3d 190, 830 N.Y.S.2d 59 (1st Dep't 2007) (holding that there was no violation of a lease obligation where the landlord and tenant were litigating the interpretation of the lease for the purposes of calculating the renewal rent); E. 55th St. Joint Venture v. Litchman,

{00034290.DOC}                                    13

Fourth, Skyline claims that attorneys' fees are not available where a party is only seeking a judicial declaration of its rights under the lease. This is wrong. Skyline's own cited case law dispels its argument. See Allerand, LLC, 19 A.D.3d 275, 277 ("Contrary to plaintiffs' argument, the circumstance that the action is one commenced by them for declaratory relief does not render the above-quoted attorney fee indemnity and reimbursement provisions inapplicable"). Likewise, the cases cited by ESB in its moving papers also demonstrate that Skyline's proposition fails as a matter of law. See Huron Assocs., LLC, 18 A.D.3d 231 (reinstating claim for attorneys' fees in an action by tenant to declare that it was not in default for failing to provide the landlord access to the premises); Sun Mei Inc., 21 A.D.3d 265 (allowing attorneys' fees in a plenary action commenced by the tenant effectively seeking declaratory relief and challenging the existence and validity of the lease). Further, the cases cited by Skyline for this erroneous proposition actually denied an award of attorneys' fees because the tenant was not in default -- not because it was an action for declaratory judgment. See Altieri v. Net Realty Holding Trust, 237 A.D.2d 551, 655 N.Y.S.2d 984 (2d Dep't 1997); H.L. Klion, Inc. v. Venimore Bldg. Corp., 21 A.D.2d 673, 674, 249 N.Y.S.2d 910 (2d Dep't 1964).[8]

Finally, Skyline erroneously claims that ESBC should be barred from seeking attorneys' fees based on the prohibition against splitting causes of action. Specifically, ESBC supposedly

126 Misc.2d 1049, 487 N.Y.S.2d 256 (1st Dep't 1984) (holding that legal fees should be denied to prevailing landlords in administrative proceedings as a matter of public policy).

[8] While in H.L. Klion, Inc., supra, 21 A.D.2d at 674, an award of attorneys' fees was not appropriate, in part, because the defendant's assertion of counterclaims did not satisfy the landlord's obligation under the relevant provision to "institute an action or summary proceeding" to obtain an award for fees, here, ESB's counterclaims in the Skyline Proceeding do suffice to satisfy the requirement that ESB institute an action or summary proceeding on account of Skyline's defaults under the License, particularly because ESB also commenced the ESB Proceeding to obtain relief for Skyline's defaults under the Lease. See Genson v. Sixty Sutton Corp., 30 Misc.3d 145(A), 926 N.Y.S.2d 344 (App. Term. 1st Dep't 2011) (distinguishing H.L. Klion, Inc. and explaining "[t]hat landlord advanced its breach of lease claim in the form of a counterclaim in this plenary action commenced by tenant, and not by way of its own independent action or proceeding, does not preclude its recovery of contractual attorneys' fees otherwise shown to be due..."); see also Duane Reade v. York Towers, Inc., 22 A.D.3d 246, 802 N.Y.S.2d 401 (1st Dep't 2005).

{00034290.DOC}                    14

cannot recover attorneys' fees in these proceedings because it did not seek attorneys' fees in the Skyline Proceeding. This argument is unavailing. Since the ESB Proceeding and the Skyline Proceeding were consolidated, and since ESB already asserted a claim for attorneys' fees in the ESB Proceeding, it was unnecessary and duplicative to assert the same exact claim again as a counterclaim in the Skyline Proceeding.[9] Thus, the prohibition against splitting causes of action is inapplicable here.

Moreover, as Skyline's cited case law makes clear, this rule only narrowly applies where (i) the merits of a prior action were litigated to their conclusion, (ii) the prevailing party neglected to seek attorneys' fees thereafter in the concluded action, and (iii) then sought to obtain same in a subsequent action. See 930 Fifth Corp. v. King, 42 N.Y.2d 886, 366 N.E.2d 875 (1977); O'Connell v. 1205-15 First Ave. Assoc., LLC, 28 A.D.3d 233, 813 N.Y.S.2d 378 (1st Dep't 2006); Hantz v. Hillman Housing Corp., 2011 WL 2292586 (N.Y. Sup. Ct. 2011).

In this case, the merits of the Skyline Proceeding were not litigated to their conclusion, but instead were consolidated with the ESB Proceeding, which includes ESB's claim for attorneys' fees. It also is noteworthy that in ESBC's cross-motion to dismiss the state court action, ESBC explicitly did seek attorneys' fees. (Halligan Reply Aff. A.) Skyline's cited case law is inapposite and its opposition unavailing. 815 Park Ave. Owners, Inc. v. Metzger, 250 A.D.2d 471 (1st Dep't 1998) ("There is no merit to defendant's argument that plaintiff improperly split its cause of action for attorneys' fees from that seeking recovery of monthly maintenance arrears, both claims having been asserted in the same action").

Based on the foregoing, ESB respectfully requests that summary judgment be granted in its favor declaring Skyline's liability for attorneys' fees.

---

[9] Should the Court require ESB to amend its Answer and Counterclaims to assert another claim for attorneys' fees, which amendment clearly would not prejudice Skyline, ESB certainly will do so.

## ESB IS ENTITLED TO SUMMARY JUDGMENT
## ON ITS SECOND COUNTERCLAIM TO ENJOIN
## SKYLINE FROM COMPENSATING ITS EMPLOYEES OR
## REPRESENTATIVES BASED ON SALES INCENTIVES

ESB has demonstrated its entitlement to partial summary judgment on its Second

Counterclaim in the Skyline Proceeding, seeking an injunction prohibiting Skyline from

breaching the protocol set forth in Paragraph 7 of the May 2005 Amendment, including inter

alia, paragraph 7(d), which states:

> All NYSR employees and representatives who work in the NYSR
> Premises or in any area of or near the Building (including without
> limitation the Visitor Center) in the course of performing NYSR-
> related duties: . . . [m]ust be salaried employees and not working
> on commission or other sales incentive.

(Halligan Aff. Ex. N, pp. 5-6; emphasis added.)

In opposition, Skyline contends that the terms "commission" and "other sales incentive"

are ambiguous and suggests that these terms could reasonably be interpreted solely to prohibit

Skyline's pre-May 2005 compensation practice of compensating its employees $1 or $2 per

ticket sold by each employee individually. By advancing this unreasonably narrow

interpretation, Skyline maintains that it is not prohibited from its current practice of

compensating employees based on Skyline's aggregate sales performance. This interpretation,

however, is contrary to the plain language of the May 2005 Amendment, is objectively

unreasonable, and cannot defeat summary judgment. There is nothing in the Amendment which

limits the terms "commission" or other "sales incentive" as Skyline posits and Skyline's

interpretation is contrary to the common understanding of the terms.

As shown in ESB's moving papers, Black's Law Dictionary defines an "incentive pay

plan" as a "compensation plan in which increased productivity is rewarded with higher pay."

See Black's Law Dictionary, 9th ed. (2009). Similarly, a "performance bonus" is defined as a "bonus given as a reward for outstanding productivity." Id. Furthermore, the American Heritage Dictionary defines "commission" as "4. [a] fee or percentage allowed to a salesman or agent for his services." See American Heritage Dictionary, 2nd college ed. (1991). None of these definitions, nor the definitions offered in Skyline's opposition, specifies -- as Skyline suggests -- that compensation only qualifies as a bonus, commission, sales incentive or other similar arrangement if it is based on an individual's productivity, rather than the productivity of the firm or company as a whole.[10]

Furthermore, Skyline's interpretation does not account for the inclusion of the phrase "other sales incentive." Indeed, it would be unnecessary and superfluous to include two descriptions -- "commission" and "other sales incentive" -- in order to prohibit one practice (as Skyline contends) -- Skyline's pre-May 2005 practice of compensating each employee based on the amount of tickets that each employee sells individually. Instead, and logically, the phrase "other sales incentive" is plainly meant to be a broader catch-all phrase prohibiting sales-based compensation arrangements that otherwise might not strictly qualify as a "commission." See, e.g., Palmieri v. Allstate Ins. Co., 445 F.3d 179, 187-188 (2d Cir. 2006) (holding that the phrase "any mobile home or personal property" unambiguously refuted the plaintiff's contention that it only applied to the contents of mobile homes); Nowak v. Ironworkers Local 6 Pension Fund, 81 F.3d 1182, 1192-3 (2d Cir. 1996) (holding that the phrase "other requirements for retirement" clearly and unambiguously prevented the plaintiff from collecting retirement benefits). Accordingly, adopting Skyline's strained interpretation would improperly rob the phrase "other sales incentive" of all meaning. Hudson Valley Props. & Rentals, Inc. v. Ursuline Provincialate,

---

[10] Skyline cites Truelove v. Ne. Capital & Advisory, 95 N.Y.2d 220, 738 N.E.2d 770 (2000), for the proposition that a discretionary bonus is not a sales commission. However, that case held that a discretionary bonus did not qualify as wages, as that term is defined in N.Y. Labor Law § 190 (1). This holding has no application to this case.

Eastern Province of the U.S., Inc., 221 A.D.2d 507, 509, 633 N.Y.S.2d 592, 594 (2d Dep't 1995) ("It is well settled that a contract should not be so interpreted as to render its terms meaningless) (citations omitted); Chock 336 Broadway Operating, Inc. v. Comanche Props., Inc., 163 A.D.2d 36, 38, 558 N.Y.S.2d 503, 505 (1st Dep't 1990) (same).

The construction rule known as ejusdem generis, cited by Skyline, actually supports ESB's interpretation of paragraph 7(b). This principle provides that "general words near a specific list are not to be construed to their widest extent but are to be held as applying only to things of the same kind as those specifically listed." Matsumura v. Benihana Nat'l Corp., 2010 WL 882968, *7 (S.D.N.Y. March 5, 2010) (emphasis added). In Matsumura, the Court was asked to define the term "expenses" in the context of a provision that read: "expenses…including the fees of attorneys, accountants, advisors, brokers, investment bankers and other representatives and transfer taxes." The Court specifically held that the purchase price at issue there did not fall within these "expenses" because "it is of a different type to the other expenses listed," all of which were "transaction costs." Id.

In contrast, here, the relevant words are "commission" and "other sales incentive." Consistent with the Court's holding in Matsumura, ESB does not seek to define "other sales incentive" to its "widest extent" in a manner inconsistent with the specific phrase "commission." Rather, ESB simply relies on the plain meaning of "other sales incentive" in a completely consistent manner with the phrase "commission" in the undisputed context applicable to both phrases.

Specifically, the May 2005 Amendment evidences a clear intent to impose a strict protocol on Skyline, its employees, and its customers with respect to a number of subjects, including, inter alia, the sale of Skyride and Observatory tickets (¶ 2), access to restrooms (¶ 3),

where Skyline customers may congregate (¶ 7(a)), where Skyline customers may enter the Premises (¶ 7(c)), and signage (¶ 10). (See, generally, Halligan Aff. Ex. N.) Paragraph 7(d) in particular restricts the conduct of Skyline employees with respect to, inter alia, dress code (bullet #1), access to the Lobby of the Building (bullet #2), permitted area of customer solicitation (bullet #3), and access to the Visitor Center of the Building (bullet #5). Id. Placed within this context, the prohibition against the use of commissions and other sales incentives (bullet #4) is clearly an attempt to impose a strict protocol and maintain certain decorum in and around the Building by eliminating unwanted behavior, i.e. aggressive pressure tactics and "hard sell" techniques by Skyline employees, which behavior also is expressly prohibited in the License. (See Halligan Aff. Ex. G, ¶ 8; Halligan Aff. Ex. J, ¶ 4.) Notably, Skyline concedes that the purpose of this provision is to minimize aggressive sales tactics. (Halligan Aff. Ex. S (Schulman 51:3-18).) Skyline's narrow and unreasonable interpretation of the provision at issue would serve to frustrate this obviously significant purpose.

Skyline counters that its aggregate sales are based on a variety of factors outside of an individual employee's control and, therefore, awarding bonuses based on aggregate sales does not incentivize an employee to be overly aggressive. This, however, is a dubious distinction of degree, not kind. It may or may not be true that an employee would be less incentivized to employ aggressive sales tactics if his productivity does not directly lead to a higher bonus. Nevertheless, each employee's productivity necessarily contributes to Skyline's aggregate sales and, thus, if an individual employee is significantly more productive by virtue of "hard-sell" tactics, and other employees follow suit, he could still benefit, because Skyline's aggregate sales would likely improve and his compensation would increase. That is the purpose of the phrase "other sales incentive" -- to ensure that Skyline employees are not incentivized to use aggressive

sales tactics at all. The same is true in a situation where an employee is compensated $1 per ticket, versus $5 per ticket. The employee compensated $1 per ticket may be <u>less</u> incentivized than the employee compensated $5 per ticket, but both practices are obviously prohibited by the May 2005 Amendment.

Skyline's distortion of ESB's position in order to conjure up the appearance of ambiguity is similarly without merit. ESB does <u>not</u> take the position that Skyline employees can only be paid a salary and nothing else (even though such an interpretation would be reasonable based upon the language of the May 2005 Amendment). Instead, ESB's position is that any bonuses or special compensation afforded to Skyline employees cannot, in any way, directly or indirectly, be contingent on its sales performance. Skyline employees still may be entitled to Christmas or other seasonal bonuses. They similarly may be entitled to other bonuses if they excel in performing some non-sales related function. However, Skyline is unequivocally barred from offering any compensation to its employees tied, directly or indirectly, to the sales performance of Skyline and/or its employees and representatives.

Simply put, Skyline's practice of paying bonuses based on its <u>aggregate</u> productivity qualifies as a "commission" and/or "sales incentive," and is unambiguously prohibited by the May 2005 Amendment. As such, to the extent the Certifications of Frederick Schulman and Walter Threadgill are offered to generate an ambiguity in the May 2005 Amendment, this Court should reject them as barred by the parol evidence rule. <u>W.W.W. Assoc. v. Gianconteri</u>, 77 N.Y.2d 157, 163 (1990) ("It is well settled that 'extrinsic and parol evidence is not admissible to create an ambiguity in a written agreement which is complete and clear and unambiguous upon

its face.'"); <u>Portside Growth & Opp. Fund v. Gigabeam Corp.,</u> 557 F.Supp.2d 427, 431, fn. 16 (S.D.N.Y. 2008)(same).[11]

Further, if Skyline was concerned about preserving its ability to reward employees based on its aggregate sales and/or attendance, it should have negotiated to include appropriate language in the May 2005 Amendment to that effect. <u>W.W.W. Assoc.</u>, <u>supra</u>, 77 N.Y.2d at 163 ("By ignoring the plain language of the contract, plaintiff effectively rewrites the bargain that was struck."). It did not, and it cannot now escape the bargain it made.

None of the cases cited by Skyline alter this conclusion. Indeed, the cases cited by Skyline that found an ambiguity involve different phrases or circumstances than those present in this case and are irrelevant. <u>See</u>, <u>e.g.</u>, <u>Graev v. Graev</u>, 11 N.Y.3d 262, 898 N.E.2d 909 (2008) (term "cohabitation" in separation agreement was ambiguous); <u>Evans v. Famous Music Corp</u>, 1 N.Y.3d 452, 807 N.E.2d 869 (2004) (ambiguity where contract allowed music publisher to deduct taxes from profits to be shared but did not expressly state whether it was similarly obligated to share savings from tax credits); <u>State of New York v. Home Indem. Co.</u>, 66 N.Y.2d 669, 486 N.E.2d 827 (1985) (insurance contract ambiguous where it was unclear whether the policy covered State only due to acts of parkway authority or for acts of any of its agencies with respect to parkway system); <u>McCarthy</u>, 283 F.3d 121 (insurance policy was ambiguous where conflicting provisions made it unclear whether a claimant timely filed claim); <u>Revson</u>, 221 F.3d 59 (retainer agreement ambiguous where unclear whether attorneys were entitled to additional fees with respect to one specific matter or all client matters generally); <u>Sayers v. Rochester Tel. Corp.</u>, 7 F.3d 1091 (2d Cir. 1993) (agreement between the parties ambiguous where parties

---

[11] Because the language of the May 2005 Amendment is not ambiguous, Skyline's insistence that this language should be construed against the drafter, <u>i.e.</u> ESB, is misplaced. <u>McCarthy v. Am. Int'l Group, Inc.</u>, 283 F.3d 121 (2d Cir. 2002); <u>Revson v. Cinque & Cinque, P.C.</u>, 221 F.3d 59 (2d Cir. 2000).

executed several, conflicting documents in tandem); Seiden Assocs., Inc. v. ANC Holdings, Inc., 959 F.2d 425 (2d Cir. 1992) (contract ambiguous where plain meaning of two provisions conflicted); Walk-In Medical Centers, Inc v. Breuer Capital Corp., 818 F.2d 260 (2d Cir. 1987) (term "adverse market conditions" in an underwriting agreement facially ambiguous); Harza Ne. v. Lehrer McGovern Bovis, 255 A.D.2d 935 (4th Dep't 1998) (phrase "cost of construction" was ambiguous in determining plaintiff's fee).[12]

Based on the foregoing, ESB respectfully requests that summary judgment be granted in its favor enjoining Skyline from compensating its employees on anything other than a salaried basis.

## POINT IV

### ESB SHOULD BE GRANTED SUMMARY JUDGMENT DISMISSING SKYLINE'S FOURTEENTH CLAIM FOR RELIEF FOR BREACH OF THE COVENANT OF GOOD FAITH AND FAIR DEALING

As shown in ESB's moving papers, Skyline's Fourteenth Claim for Relief for breach of the covenant of good faith and fair dealing should be dismissed since Skyline only seeks to recover its attorneys' fees. As ESB pointed out, and Skyline does not refute, there is no agreement, statute, or court rule that allows Skyline to recover attorneys' fees against ESB. The Lease and License only allow ESB to obtain an award for attorneys' fees. As such, the American Rule mandates dismissal of this claim.

Skyline seeks to avoid dismissal by citing to two companion cases that held "consequential damages resulting from a breach of the covenant of good faith and fair dealing

---

[12] Skyline's remaining cases, cited at pages 27-30 of its brief, are likewise inapposite. See Sutton v. E. Riv. Sav. Bank, 55 N.Y.2d 550, 435 N.E. 1075 (1982); O'Neil Supply Co. v. Petroleum Heat & Power Co., 280 N.Y. 50, 19 N.E.2d 676; Fox Film Corp. v. Springer, 273 N.Y. 434, 8 N.E.2d 23 (1937); Trump-Equitable Fifth Ave. Co. v. H.R.H. Constr. Corp., 106 A.D.2d 242, 485 N.Y.S.2d 65 (1st Dep't 1985); Integrated Sales v. Maxell Corp. of Am., 94 A.D.2d 221, 463 N.Y.S.2d 809 (1st Dep't 1983); Sheets v. Sheets, 22 A.D.2d 176, 254 N.Y.S.2d 320 (1st Dep't 1964); Space Imaging Europe, Ltd. v. Space Imaging L.P., 38 F.Supp.2d 326 (S.D.N.Y. 1999); Mg Refining & Marketing, Inc. v. Knight Enters., Inc., 25 F.Supp.2d 175 (S.D.N.Y. 1998); Eskimo Pie Corp. v. Whitelawn Dairies, Inc., 284 F.Supp. 987 (S.D.N.Y. 1968).

may be asserted in an insurance contract context..." Panasia Estates, Inc v. Hudson Ins. Co., 10 N.Y.3d 200, 203, 886 N.E.2d 135 (2008); Bi-Economy Mkt., Inc. v. Harleysville Ins. Co. of N.Y., 10 N.Y.3d 187, 886 N.E.2d 127 (2008). Since the consolidated proceedings before this Court indisputably are not in the sui generis "insurance contract context," these cases are meaningless here.[13]

More fundamentally, ESB is entitled to summary judgment on this claim because the underlying purpose of the implied covenant of good faith and fair dealing is simply not present here. The covenant of good faith and fair dealing is "breached when a party to a contract acts in a manner that, although not expressly forbidden by any contractual provision, would deprive the other party of the right to receive the benefits under their agreement." Jaffe v. Paramount Commc'ns Inc., 222 A.D.2d 17, 22, 644 N.Y.S.2d 43, 47 (1st Dep't 1996). Skyline's claim fails because it does not, and cannot, demonstrate that reimbursement for attorneys' fees it incurred in connection with this litigation -- the sole relief sought for this claim -- is a benefit that it is entitled to under the Lease and/or License. Id. ("However, plaintiff failed to allege any facts to demonstrate that Paramount deprived him of any rights he had under the Agreement..."). Accordingly, Skyline's Fourteenth Claim for Relief fails as a matter of law.

---

[13] As the Court of Appeals of New York in Bi-Economy, supra, explained, the insurance contract context is unique because "[a]n insured bargains for more than mere eventual monetary proceeds of a policy; insureds bargain for such intangibles as risk aversion, peace of mind, and certain and prompt payment of the policy proceeds upon submission of a valid claim." 10 N.Y.3d 187 at 194. Therefore, an insurance company's breach of its implied covenant of good faith and fair dealing by failing to act "honestly, adequately, and-most importantly-promptly . . . cause[s] additional damages that the policy was purchased to protect against in the first place." Id. at 195; see also Acquista v. N.Y. Life Ins. Co., 285 A.D.2d 73, 81 (1st Dep't 2001.) The availability of consequential damages in the unique insurance contract context has no application in this landlord and tenant dispute. See Goldmark, Inc. v. Catlin Syndicate Ltd., 2011 WL 743568, *3 (E.D.N.Y. Feb. 24, 2011); Simon v. Unum Group, 2009 WL 2596618, **7-8 (S.D.N.Y. Aug. 21, 2009).

### ESB SHOULD BE GRANTED SUMMARY JUDGMENT DISMISSING SKYLINE'S FIFTEENTH CLAIM FOR RELIEF FOR PRIMA FACIE TORT

As shown in ESB's moving papers, ESB amply demonstrated that Skyline's Fifteenth Claim for Relief should be dismissed. Skyline's claim for prima facie tort is premised entirely upon Skyline's alleged "belief" that ESBC is trying to destroy its business so that ESBC can recover the Premises from Skyline prior to the expiration of Skyline's Lease. Skyline does not come close to meeting the high bar it needs to meet to succeed on this claim which requires that it plead and prove as a matter of law that ESB's actions were done with the <u>sole intent to harm it, and for no other legitimate purpose</u>. See <u>Picture People, Inc. v. Imaging Fin. Servs., Inc.</u>, 735 F. Supp. 2d 12, 22 (S.D.N.Y. 2010). Testimony from all ESBC and ESBI authorities has been consistent that this simply is not the case, and Skyline has proffered no admissible evidence to the contrary. In fact, the evidence presented by Skyline confirms just the opposite. (<u>See, e.g.</u>, Halligan Aff. Ex. U (Ghazi 283:14-284:25); Halligan Reply Aff. Ex. F (Malkin 83:8-18; 129:11-21; 156:22-157:7; 193:17-194:11); Certification of Charles Stewart III ("Stewart Cert.") Exs. L (ESB-01835), MM ["To that end, and as previously stated during our mediation hearings, ESB is not looking to evict NY Skyride from the building."].)

A.    **Skyline Cannot Demonstrate that ESB Acted With The Requisite Malice**

Skyline seems unable to believe that ESB wants it to remain in the Premises because it alleges that ESB, and specifically Anthony Malkin, does not "like" Skyline. But it is of no legal significance whether ESB "likes" Skyline or not. ESB does not have to "like" Skyline. In fact, Mr. Malkin makes clear that while he does not subscribe to the way Skyline operates its business, he appreciates that Skyline pays a significant amount rent to ESB and that it has rights

as a tenant pursuant to its lease. (Halligan Reply Aff. Ex. F (Malkin 67:18-71:12; 85:8-12; 172:12-20).)

Mr. Malkin's e-mail description of Skyline, while perhaps offensive to Skyline, accurately reflects his consistent opinion of Skyline: "Their operation is crap, but their rent is real." (Halligan Reply Aff. Ex. F (Malkin 67:18-25).) Skyline makes much of Mr. Malkin's description of Skyline as "crap" and "crappy," but Mr. Malkin explains that it is "a common expression of [his] for something which isn't good." (Id. (Malkin 70:9-10).) He even remarks that he "could make the same comment about an auto dealership, [or] that water pitcher which keeps leaking." (Id. (Malkin 70:7-9).) Mr. Malkin concedes that "[t]here are a lot of quips that you will find in e-mails from [him] to other people . . . [j]ust like saying Skyline's operation is crap . . . " (Id. (Malkin 119:18-23).) Such "quips" do not demonstrate the requisite malice necessary to sustain a claim for prima facie tort.

Nor do such "quips" or any of the so-called "bon mots" Skyline quotes in its opposition mean that ESB does not value Skyline's tenancy. In fact, ESBC <u>does</u> value Skyline as a tenant when it pays its rent. (Halligan Reply Aff. Ex. F (Malkin 154:17-20).) When it does not pay its rent, then ESB rationally considers Skyline a bad tenant. (Id. (Malkin 154:21-155:4).)[14]

Admittedly, Mr. Malkin believes that Skyline "misbehaves" at times, by not performing all of its obligations under the Lease, not maintaining the appearance of its facility, not operating its retail according to the Lease, harassing visitors inside and outside of the Building, and otherwise engaging in behavior that is prohibited by the Lease. (Halligan Reply Aff. Ex. F (Malkin 22:20-25:25; 32:21-33:6; 80:12-81:4).)

---

[14] Mr. Malkin makes the obvious distinction which Skyline struggles to understand. "I mean, you already have me on record saying I think their operation is crap, so clearly there's a difference between whether they're a good tenant or a bad tenant and what I think of them as a business." (Halligan Reply Aff. Ex. F (Malkin 155:6-10).)

Ultimately, however, Mr. Malkin has concluded that ESB is best served by Skyline remaining in the Premises until its Lease expires, so long as Skyline performs according to its Lease. Despite Skyline's efforts to induce Mr. Malkin to state otherwise, his testimony on this critical point was consistent:

> At the moment, frankly, I'm perfectly satisfied, provided they perform according to their lease, to collect their rent and charges and have them in the building. We did sign the lease with them. We're obligated to do certain things. They're obligated to do certain things. (Halligan Reply Aff. Ex. F (Malkin 83:8-14).)

> I can say that I understand at this point [Peter Malkin] agrees with me, and my position, so long as they behave according to their lease, the rent money is good, we don't need the down time, that if they're not performing under their lease, they should be disciplined, and we should enforce our rights. And then when their lease ultimately comes up for termination, based on what we know today and the way we look at it today and what Skyline is today, we would not renew their lease. (Id. (Malkin 129:11-21).)

> Periodically, I will probably refresh, depending upon our payment stream from them and whether they're in bankruptcy or not, what our alternatives are from time to time, but otherwise, aside from maintaining optionality in one specific way, they pay their rent, they behave under their lease, fine. They don't pay their rent and charges and/or don't behave under their lease, we're going to pursue our remedies, the building will. (Id. (Malkin 156:22-157:7).)

> The rent, while they're paying it and they perform under their lease, is good. We're going through a transition period at the building. That transition has a number of years to go. I'm not interested in losing that rent during that transition period. If I were to lose the rent, I could live with it. If they leave, I'll lose that rent for the period that I relet the space. I'll lose that rent for the period that I have to sign a new lease which has free rent. I'll lose money by having to prepare the space. If I have to, I will. It's not my preference at this time. I'm perfectly prepared for them to continue to operate according to their lease in compliance with the law in their current space so long as they pay their charges and behave through the term of their lease. (Id. (Malkin 193:17-194:11).)

Indeed, even the evidence upon which Skyline relies proves ESB's rational business-like attitude regarding Skyline. (See Stewart Cert. Ex. L (ESB-01835) ["While Skyline's attraction is not a real addition to the building, it does pay very meaningful rent and we do not have a present program established through the BRC observatory experience for their space"].) In sum, there is absolutely no evidence from which a reasonable fact finder could determine that ESB has acted with any intent to harm Skyline -- much less with the sole intent to harm Skyline -- and not simply to enforce its rights under the Lease and License, as well as under the law. Skyline's sole unsubstantiated quoted allegation from its Complaint that "Defendants' campaign of harassment and interference in Skyline's operations . . . was undertaken by them for the sole purpose of destroying or taking over Skyline's business" (Complaint ¶ 205) is insufficient to save its claim against ESBC.[15]

Moreover, even if ESB somehow on some occasion acted maliciously with respect to Skyline -- which it has not -- as stated, for Skyline to succeed on its claim it would have to demonstrate that ESB's actions were done with the sole intent to harm Skyline, and for no other legitimate purpose. Picture People, Inc. v. Imaging Fin. Servs., Inc., 735 F. Supp. 2d 12, 22 (S.D.N.Y. 2010); Colina v. One E. River Place Realty Co., LLC, 2000 WL 1171126 at *6 (S.D.N.Y. Aug. 17, 2000); Burns Jackson Miller Summit & Spitzer v. Lindner, 59 N.Y.2d 314, 333, 451 N.E.2d 459 (1983); Cohen's W. 14th St. Corp. v. Parker 14th Assocs., 125 A.D.2d 249, 509 N.Y.S.2d 340 (1st Dep't 1986).

---

[15] Nationwide Tarps, Inc. v. Midwest Canvas Corp., 228 F.Supp.2d 202, 205 (N.D.N.Y. 2002), cited by Skyline, does not require a contrary result. In that case, the plaintiff sent a letter to its customers and defendant's customers, stating that the parties were engaged in litigation over the defendant's false marketing statements and the customers' "business may be affected" thereby. The Court denied summary judgment and held that issues of fact exist as to whether the plaintiff sent the letter with malice because "[i]t is unclear why it was written" and the "befuddling nature of [plaintiff's] letter muddies its purpose..." Id. at 214. By contrast, all of the purportedly tortious conduct identified by Skyline was plainly done to enforce ESB's rights under the Lease and the License.

Here, all of ESB's actions clearly were motivated by legitimate business reasons.

Skyline complains about the following actions by ESB: (i) ESB served Skyline with five rent

demands and two notices to cure over the course of seven years; (ii) ESB served Skyline with a

notice to cure regarding Skyline's gift shop, which notice subsequently was withdrawn; (iii) ESB

allegedly placed a "confidential informant" in Skyline's business; (iv) ESB sent a letter to

Skyline complaining about popcorn smells emanating from its Premises; and (v) ESB allegedly

persuaded the New York Police Department and City of New York to enforce the current law

prohibiting Skyline's activities on the streets surrounding the Empire State Building, resulting in

the issuance of tickets to and arrests of certain Skyline employees.[16] Each of these alleged

actions, when evaluated independently or collectively, all have legitimate business justifications

and do not make out a claim for prima facie tort.

## 1. **Legal Notices**

Skyline complains that ESBC served it with five Rent Demands over the course of seven

years (only one of which Rent Demands even resulted in the commencement of a non-payment

proceeding). (Stewart Cert. Exs. S, T.) A Rent Demand is a notice demanding that overdue rent

and additional rent be paid. While Skyline makes a big deal about these Rent Demands, in a

Building which had 600 tenants, Rent Demands are routinely served when past due notices are

ignored; obviously, there is a non-tortious business reason for doing so. Skyline tries to

distinguish the Rent Demands served on it because in one of those demands, ESB sought to

collect $431,000 in retroactive charges for security guards. Ultimately, however, after numerous

letters between counsel for both parties, numerous documents exchanged, and further research,

---

[16] The rest of Skyline's allegations relate to actions that occurred prior to the execution of the May 2005
Amendment, which contained a release of all claims. Thus, the allegations regarding, inter alia, negotiations for the
Cartoon Museum, shutting down of the West Escalators, and re-routing of Observatory traffic, are irrelevant to the
issues here and should be disregarded by the Court.

ESB credited Skyline for such charges. (See, e.g., Stewart Cert. Exs. DD, EE.) Giving Skyline a credit for disputed charges is not tortious.

With respect to the Notices to Cure, in one instance, a Notice to Cure was served on Skyline due to the condition of its Premises. (Stewart Cert. Ex. U.) All of the complained about conditions were subsequently cured, and the Notice was withdrawn. (Stewart Cert. Ex. V.) The other Notice to Cure was the predicate to the Skyline Proceeding, and the issues raised therein ultimately were raised in the Adversary Proceedings. (Stewart Cert. Ex. CC; Halligan Aff. Exs. A (pp. 18-24), D (pp. 31-35).) Such conduct is not tortious.[17]

Skyline also routinely makes much about a single letter sent to Skyline in December 2008 where ESBC complains about popcorn smells emanating from Skyline's Premises. (Halligan Reply Aff. Ex. B.) Skyline is permitted to sell popcorn, but the Lease also requires Skyline to prevent food odors in the lobby in the Building. (Id; Halligan Aff. Ex. F Article 44(H).) ESB was within its rights to complain about popcorn odors emanating from Skyline's Premises, and indeed, ESB engaged in litigation with another tenant in the Building over pervasive pizza odors emanating into the lobby of the Building. (See Halligan Reply Aff. Ex. C.) In any event, this single letter regarding popcorn odors is not tortious.

### 2. Confidential Informant

During discovery, Skyline tried to make much of an internal email from ESB's Director of Security in which ESB discovered from a "confidential informant" that one of Skyline's employees was a Level 3 Sex Offender. (Stewart Cert. Ex. LL.) Skyline asked numerous ESB

---

[17] Skyline also tries to make much of a purported "sanction" issued by the Justice Ramos in the Skyline Proceeding before it was removed. Suffice to say, Skyline's summary of events is inaccurate and no money is owed to Skyline. Furthermore, while ESB's first challenge to Skyline's operation of its gift shop turned out to be inaccurate, it was not raised maliciously, but only was raised when a new Director of Observatory reviewed all of the documents which he erroneously believed made up the parties' Lease and License to determine Skyline's compliance thereof. (Halligan Aff. Ex. G (Ghazi 283:14-284:25).) There was nothing malicious about Mr. Ghazi's actions. He was simply trying to do his job. Skyline knows this and, in typical fashion, tries to exaggerate circumstances to paint an inaccurate picture of reality.

representatives whether ESB placed a "confidential informant" among Skyline's employees, and no ESB representative had any information of such an action. (Halligan Reply Aff. Exs. G and H (Ghazi 274:13-275:9; O'Donnell 89:19-90:2; 90:13-91:19).) Rather, the testimony indicated that the term which actually was used -- "confidential informant (NYSR employee)" -- merely was meant to mean that a Skyline employee confidentially informed ESB of this fact. (Halligan Reply Aff. Ex. G (Ghazi 283:14-284:25).) A reading of the email referenced by Skyline makes this very clear. Again, this is not tortious, nor malicious.

### 3. New York Police Department

Finally, Skyline rests most of its claim on actions which arose only recently, are not a part of its Complaint, and frankly, are not relevant here. Specifically, Skyline seeks to blame ESB for actions taken by the N.Y.P.D. and the City of New York, as if ESB somehow controls the City of New York. Obviously, it does not. Skyline's attempt to blame ESB for Skyline's own violation of existing laws and for the City's resulting actions to enforce such laws demonstrates the utter irrationality of Skyline's claims and legal positions here. Skyline is correct that ESB complained to the N.Y.P.D. about Skyline's hawkers on the street violating City laws. However, this is another "so what." ESB is running a business. It is entitled to seek the protection of the laws. Skyline's aggressive hawkers on the street impair and denigrate ESB's business, make it difficult to attract tenants to the Buildings, and upset its employees, visitors and guests – all in the line of conducting illegal sales on public property adjoining ESB's property.[18] (Stewart Cert. Ex. FF.) ESB has every right to complain to the City and the N.Y.P.D. about this conduct. But what the City and the N.Y.P.D. choose to do with these complaints is in their own discretion. Obviously, the City and N.Y.P.D. believed Skyline's conduct to be illegal, as it

---

[18] The conduct of Skyline's hawkers also interferes with other businesses and residents in the area, many of which have also complained to the N.Y.P.D. in Community Meetings. (See, e.g., Halligan Reply Aff. Ex. D.) There are numerous public policy reasons for prohibiting the conduct of Skyline, but ESB will leave this to the City to resolve.

issued tickets and arrested Skyline employees. Skyline has challenged the actions of the City and N.Y.P.D., and that case is pending. That case has nothing to do with ESB or this case.

In sum, all of ESB's actions with respect to Skyline have legitimate business justifications, and Skyline cannot meet its burden of demonstrating that ESB acted with the sole, malicious intent to harm Skyline. Its claim thus fails.

**B.    Skyline Cannot Prove Special Damages**

Skyline's claim also fails because Skyline cannot demonstrate that it suffered any special damages. The evidence Skyline presents in this case is akin to the evidence presented in U.S. ex rel. Evergreen Pipeline Constr. Co. v. Merritt Meridian Constr. Corp., 95 F.3d 153 (2d Cir. 1996) (cited by Skyline), which the Court found insufficient to sustain its claim for prima facie tort. There, the plaintiff claimed it could only plead "lost profits and lost business opportunities with no greater specificity than $500,000…" Id. at 161. The Court properly held that, "[r]ound numbers appear, however, not to be good enough under New York law." Id. (citation omitted); see also Vigoda v. DCA Prods. Plus Inc., 293 A.D.2d 265, 741 N.Y.S.2d 20 (1st Dep't 2002) (dismissing the plaintiff's complaint where it "sets forth damages in round numbers which amount to mere general allegations of lost sales from unidentified lost customers") (citation omitted).

Here, Skyline's pleading and moving papers are even more deficient. Skyline's Fifteenth Claim for Relief does not even attempt to provide a round number but, instead, merely claims:

> [D]amages including, but not limited to, the loss of customers and
> good will, the loss of money in the form of fees it paid to ESBC (a
> portion of which was shared with one or more Defendants),
> without receiving consideration therefore, the loss of its
> employees' services and the enormous expenditure of time and
> effort (and legal fees) responding to Defendants' outrageous
> conduct when Skyline's efforts would have been more

> productively spent operating Skyride and attending to its
> customers' needs.

(Halligan Aff. Ex. C, ¶ 207.) In other words, Skyline's "damages" are its attorneys' fees, and its

employees' time spent in responding to ESB's legal notices, prosecuting its meritless litigation

against ESB, and defending against its now admitted breaches of the Lease and License. As

demonstrated above (see Point IV), Skyline is not entitled to recover its attorneys' fees. Nor is

Skyline permitted to recover some percentage of its employees' salaries which Skyline has

randomly determined were attributed to working with its attorneys. (Certification of Frederick

Schulman ("Schulman Cert.") Ex. A.)

To the extent Skyline also seeks to recover "lost sales", it simply has presented no

admissible evidence to support such a claim. The purported "expert" report Skyline submits

from Maurice Whalen (Stewart Cert. Ex. J) is unsworn and is otherwise inadmissible at trial.

See Hollman v. County of Suffolk, 2011 WL 2446428, *13 (E.D.N.Y. June 15, 2011); Brazier v.

Hasbro, Inc., 2004 WL 1497607, *2 (S.D.N.Y. July 6, 2004); Phoenix Ins. Co. v. APF Fire

Protection, Inc., 2011 WL 2848183, *4 fn. 4 (S.D.N.Y. April 7, 2011).

Skyline cannot overcome this deficiency by arguing that Mr. Whalen can testify

regarding his report at trial because neither Mr. Whalen nor any of his associates were identified

as witnesses for trial in the pre-trial order.[19] Therefore, any testimony from an expert witness

would be precluded at trial, and the report should be disregarded here. See Fed. R. Civ. P.

37(c)(1); Fed. R. Civ. P. 26(a)(2)(A); Bastys v. Rothschild, 154 Fed. Appx. 260 (2d Cir. 2005);

Crucey-Castillo v. U.S., 2009 WL 564287, *5 (S.D.N.Y. March 5, 2009).

---

[19] Counsel for Skyline informed counsel for ESB that Mr. Whalen is now deceased. While Skyline apparently
considered having Mr. Whalen's associate adopt his report, it instead stated in the Pre-Trial Order that it did not
intend to introduce any damages expert at trial, and no associate was listed as a witness for trial.

In the absence of any expert report on damages, Skyline is left with a non-detailed hearsay affidavit from its Chairman, Frederick Schulman, which purports to attribute a reduction in sales to ESB. (Schulman Cert. Ex. B.) There is simply no evidence or proof that any reduction in Skyline's sales figures are attributable to any conduct by ESB, and its alleged "proof" falls flat. Skyline cannot prove any special damages and its claim for prima facie tort fails for this additional reason.

## POINT VI

### ESB SHOULD BE GRANTED SUMMARY JUDGMENT DISMISSING SKYLINE'S EIGHTEENTH CLAIM FOR RELIEF FOR TORTIOUS INTERFERENCE WITH CONTRACT

Finally, in its moving papers, ESB demonstrated that it is entitled to summary judgment dismissing Skyline's Eighteenth Claim for tortious interference with contract asserted against ESBA. There is simply no evidence that ESBA interfered with the Lease and/or License in any way.

As Skyline acknowledges in its opposition, ESB and ESBA's motion seeks dismissal of this claim on the grounds that ESBA has no authority to direct the operations of ESBC and plays no role in directing the operations of ESBC. In response to this argument, Skyline only contends that the record is not clear on this point (Opp. Br. p. 38.), because if the record were clear, Skyline would have to concede that its claim should be dismissed. In fact, however, the record is crystal clear on this point, and a reading of Mr. Malkin's deposition testimony, the only relevant evidence, along with certain corporate documents on this point, confirms this.

Specifically, Mr. Malkin explained in his deposition that Malkin Holdings is the supervisor of ESBC, and as supervisor of ESBC, Malkin Holdings directs "the day-to-day activities of the building in concert with the direction of [sic] the permission of ownership."

(Halligan Reply Aff. Ex. F (Malkin 12:21-13:5).) While Malkin Holdings also is the supervisor of ESBA, ESBA plays no role in the management of the Empire State Building.

> Q.   Does Associates play any role in the management of the Empire State Building?
>
> A.   No.

(Id. (Malkin 51:19-22).)

As supervisor of ESBA, all Malkin Holdings does is prepare financial statements, supervise the filing of necessary SEC filings, handle any financing that is required and service the entity. (Halligan Reply Aff. Ex. F (Malkin 57:7-12).) Under the Operating Sublease between ESBA and ESBC, which is scheduled to remain in effect until 2076, ESBA has no role or authority to conduct the operation and leasing of the Empire State Building (Id. (Malkin 52:12-17; Malkin Aff. Ex. A), and has no standing even to express opinions about the operations and/or tenants of ESBC. (Id. (Malkin 121:24-122:7).)

Skyline tries to confuse this fact by pointing out that Mr. Malkin is an agent for certain investors in ESBA, and is an investor himself in ESBA. (Halligan Reply Aff. Ex. F (Malkin 51:5-19).) These facts, however, are irrelevant, as Mr. Malkin made it clear that his actions with respect to ESBC all were done as an agent, i.e., the supervisor, of ESBC, not as an investor of ESBA or on behalf of ESBA. "As an agent for [ESBA], the day-to-day operations of the building, other than what comes through to [ESBA] [i.e., rent], that's a separate Chinese box, if you will, which is [ESBA's] world. This [i.e. emails regarding Skyline], is [ESBC's] world." (Id. (Malkin 102:23-103:14; 122:8-12).) Indeed, Mr. Malkin's actions relating to Skyline only could be done by him as an agent of ESBC, because ESBA has no authority to direct the operation or leasing of the Building – and thus ESBA has not authority to deal with Skyline or its Lease.

Skyline ineffectively tries to diminish the steadfast testimony of Mr. Malkin by arguing that the Operating Sublease and public filings of ESBA contradict his testimony. They do not. First, Skyline argues that Article 6 of the Operating Sublease explicitly preserves ESBA's right to perform ESBC's obligations under the Sublease, thus somehow giving ESBA authority to direct the operations of the Empire State Building, which authority it does not otherwise have. Notably, Skyline cites to this provision of the Operating Sublease without any reference to the Master Lease, which actually controls, as Article 6 of the Operating Sublease merely states that:

> Sections 6.01 and 6.02 of the [Master] Lease are hereby incorporated herein by reference, except that wherever "Lessor", "Lessee" and "Lease" are referred to, same shall be deemed instead to be a "Sublessor", "Sublessee" and this [Operating] Sublease respectively.

(Opp. Brf. at 39.) Nowhere does Skyline actually attach the Master Lease or otherwise quote the provision of the Master Lease upon which Skyline is relying. Instead, Skyline merely states in its opposition that ESBA explicitly preserves ESBA's right to perform ESBC's obligations, even though ESBC is obligated to satisfy ESBA's obligations under the Master Lease, including with respect to real estate taxes, insurance and property maintenance. (Opp. Br. p. 39). What Skyline fails to mention, however, is that the Master Lease makes clear that ESBA only can perform ESBC's obligations under the Operating Sublease if ESBC fails to perform these obligations after receiving notice from ESBA to do so, and ESBA does so without waiving or releasing ESBC from any of its obligations under the Lease. (Halligan Reply Aff. Ex. E (Master Lease, Article 6).) Most significantly, such provision serves only to protect ESBA's ultimate obligation to pay real estate taxes, procure insurance, and otherwise perform under the Master Lease, and in no way grants ESBA the authority to direct the building's operations.

Furthermore, the fact that ESBA's 10-K states that ESBA is authorized to conduct physical inspections of the building does not also mean that ESBA can direct ESBC as to how a tenant should perform under its Lease.

Accordingly, while Skyline argues that "[w]hether and to what extent the Malkins undertake a particular action on behalf of ESBC or [ESBA] is never entirely clear," (Opp. Br. p. 41), it appears only unclear to Skyline, because it is crystal clear to Mr. Malkin, and respectfully should be clear to this Court, based on the record, that any of Mr. Malkin's actions undertaken to direct the operations of ESBC, or the tenants thereof, were done as President of Malkin Holdings, the supervisor of ESBC. His actions with respect to Skyline and its Lease or License could not and did not have anything to do with ESBA – which only is the passive sublessor of the Building. Accordingly, Skyline failed to raise any genuine issue of material fact.

Even if Skyline raises sufficient issues of fact -- which it does not -- Skyline's opposition utterly ignores the well settled rule, set forth in ESB's moving papers, that economic justification is a defense to a claim for tortious interference with contract. Foster v. Churchill, 87 N.Y.2d 750-751, 665 N.E.2d 153 (1996). In order for Skyline to overcome this defense of economic interest, it must show that ESBA acted maliciously, fraudulently or illegally. Id., 87 N.Y.2d at 750 ("The imposition of liability in spite of a defense of economic interest requires a showing of either malice on the one hand, or fraudulent or illegal means on the other.") (citation omitted). As shown above (see, supra, Point V), and in ESB's moving papers, Skyline does not, and cannot, raise any genuine issue of material fact refuting the fact that, with respect to Skyline, the Lease or the License, ESB and ESBA have consistently acted out of economic self interest. IMG Fragrance Brands, LLC v. Houbigant, Inc., 679 F.Supp.2d 395, 406 (S.D.N.Y.2009) (dismissing claim for tortious interference of contract where defense of economic interest was established

and there was no allegation or evidence of malicious, fraudulent or illegal conduct); <u>Daniels v.</u>

<u>St. Luke's-Roosevelt Hosp. Ctr.</u>, 2003 WL 22410623 at *3 (S.D.N.Y. Oct. 21, 2003) ("In any

case, the record does not support plaintiff's claim that LaFrance displayed a reckless disregard

from which malice toward the plaintiff can be inferred."). Therefore, ESB and ESBA

respectfully request that this Court grant it summary judgment dismissing this claim in its

entirety.

## CONCLUSION

For all the foregoing reasons it is respectfully submitted that ESB and ESBA's motion be

granted in its entirety.

Dated: New York, New York
      September 16, 2011

STERN TANNENBAUM & BELL LLP

By:    s/ Francine Nisim
       David S. Tannenbaum
       Francine Nisim
       Rosemary Halligan
380 Lexington Avenue
New York, NY 10168
(212) 792-8484
(212) 792-8489 (facsimile)
Attorneys for Empire State Building Company L.L.C.,
Empire State Building, Inc. and Empire State Building
Associates L.L.C.

*-and-*

DUANE MORRIS, LLP
*A Delaware Limited Liability Partnership*
1540 Broadway
New York, NY 10036
(212) 692-1000
(212) 208-4521 (facsimile)
Rudolph J. DiMassa, Jr., Esq.
William C. Heuer, Esq.