UNITED STATES BANKRUPTCY COURT                    **FOR PUBLICATION**
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------------X
In re:                                                          :
                                                                :    Chapter 11
     NEW YORK SKYLINE, INC.,                        :    Case No. 09-10181 (SMB)
                                                                :
             Debtor.           :
------------------------------------------------------------------------X
EMPIRE STATE BUILDING COMPANY L.L.C.                            :
and EMPIRE STATE BUILDING, INC.,                                :
                                                                :
                                                                :
           Plaintiffs,            :
                                                                :
     — against —                                     :    Adv. Proc. No. 09-1107
                                                                :
NEW YORK SKYLINE, INC.,                                         :
                                                                :
           Defendant.             :
------------------------------------------------------------------------X
NEW YORK SKYLINE, INC.,                                         :
                                                                :
           Plaintiff,             :
                                                                :
     — against —                                     :    Adv. Proc. No. 09-1145
                                                                :
EMPIRE STATE BUILDING COMPANY L.L.C.,                          :
EMPIRE STATE BUILDING, INC. and EMPIRE                         :
STATE BUILDING ASSOCIATES L.L.C.,                              :
                                                                :
           Defendants.            :
------------------------------------------------------------------------X

## MEMORANDUM DECISION REGARDING
## MOTION FOR PARTIAL SUMMARY JUDGMENT

**A P P E A R A N C E S :**

DUANE MORRIS, LLP
1540 Broadway
New York, NY 10036

     Rudolph J. DiMassa, Jr., Esq.
     William C. Heuer, Esq.
         Of Counsel

1

— and —

STERN TANNENBAUM & BELL LLP
380 Lexington Avenue
New York, NY 10168

> David S. Tannenbaum, Esq.
> Francine Nisim, Esq.
> Rosemary Halligan, Esq.
> > Of Counsel

*Attorneys for Empire State Building Company L.L.C.,*
*Empire State Building, Inc. and Empire State Building*
*Associates L.L.C.*

STEWART OCCHIPINTI, LLP
65 West 36th Street, 7th Floor
New York, NY 10018

> Charles A. Stewart, III, Esq.
> Frank S. Occhipinti, Esq.
> > Of Counsel

— and —

BACKENROTH FRANKEL & KRINSKY, LLP
489 Fifth Avenue, 28th Floor
New York, New York 10017

> Mark Frankel, Esq.
> > Of Counsel

*Attorneys for New York Skyline, Inc.*

**STUART M. BERNSTEIN**
**UNITED STATES BANKRUPTCY JUDGE:**

The parties to these two adversary proceedings have been locked in litigation for many

years over their respective rights and obligations under a lease and license, amended from time to

time, pertaining to the debtor's occupancy in the Empire State Building (the "Building"). The

Empire State Building parties, identified below, now move for partial summary judgment in

connection with claims they have asserted against the debtor and dismissing certain claims that

2

the debtor has asserted against them.  For the reasons that follow, the motion is granted in part
and denied in part.

## BACKGROUND

The background to these adversary proceedings is explained in *Empire State Building Co.
v. New York Skyline, Inc. (In re New York Skyline, Inc.)*, 432 B.R. 66 (Bankr. S.D.N.Y. 2010)
("*Prior Decision*").  I assume familiarity with the *Prior Decision*, and limit the background
discussion to the facts necessary to provide context to the disposition of the pending motion.[1]

At all relevant times, the debtor New York Skyline, Inc. ("Skyline") has operated an
attraction in the Building involving a simulated helicopter ride over New York City.  The
Building is owned by non-party Empire State Land Associates L.L.C., a limited liability
company wholly-owned by defendant Empire State Building Associates L.L.C. ("ESB
Associates"), which is the master lessee of the Building.  (*Certification of Charles A. Stewart, III
in Opposition to Motion for Summary Judgment*, dated Aug. 19, 2011 ("*Stewart Certification*"),
Exhibit OO (ESB Associates' Form 10-K for the fiscal year ended Dec. 31, 2010 ("*Form 10-
K*")), at 3 (ECF Doc. # 68).)[2]  ESB Associates subleases the Building to the defendant Empire
State Building Company, L.L.C., ("ESB"), (*id.*), and ESB and Skyline are parties to a sublease,
as amended (the "Lease") and a license, as amended (the "License"), both of which are described
at greater length in the *Prior Decision*.  Finally, the defendant Empire State Building, Inc.

---

[1]      Unless otherwise stated, citations to "ECF" refer to the docket in adversary proceeding no. 09-1145.
Where ECF refers to the docket in the main case, it is noted parenthetically.

[2]      This exhibit consists of excerpts that are hand-numbered.  The numbers in the citation to the exhibit refer to
the hand-numbers.

("ESBI") owns the leasehold for the observation decks located on the 86th and 102nd floors

(collectively, the "Observatory").

The original Lease and License date back to 1993, and the current versions, which

include the May 2005 Agreement also discussed at length in the *Prior Decision*, were assumed in

the bankruptcy case.  The parties' rights and obligations under the Lease and License, and more

generally, Skyline's tenancy, are the subject of two adversary proceedings presently pending

before the Court.  The first of the adversary proceedings, commenced prepetition by Skyline in

New York state court (the "State Court Action"), was removed to this Court by ESB shortly after

Skyline filed its chapter 11 petition.  ESB filed counterclaims in the State Court Action (the

"ESB Counterclaims").  In addition, after the removal of the State Court Action, ESB filed an

adversary proceeding in this Court ("ESB Action").

Many of the claims have been resolved, and the ESB parties' motion focuses on the five

claims discussed below.  ESB contends that it is entitled to summary judgment on its two

affirmative claims as well as summary judgment dismissing three claims asserted by Skyline.

Skyline raises certain objections relating to the Court's jurisdiction and authority, and contends

that issues of fact preclude summary judgment.

**DISCUSSION**

**A.      The Court's Jurisdiction and Authority**

As an initial matter, Skyline contends that this Court lacks subject matter jurisdiction

over the claims asserted in the adversary proceedings, lacks the authority to enter a final

judgment on those claims, but even if jurisdiction exists, the Court should abstain from

4

exercising it.  To put these arguments in context, and understand the Court's reason for rejecting them, it helps to review some of the prior proceedings in the bankruptcy case.

Skyline filed this chapter 11 case on January 12, 2009.  Shortly thereafter, ESB removed the State Court Action and commenced the ESB Action.  Skyline promptly moved for an order remanding the State Court Action and abstaining from deciding the ESB Action.

Around this same time, Skyline made a motion to extend its time within which to assume or reject the Lease and to extend its exclusive period within which to file a plan and solicit acceptances.  (*See Application for Order Extending Time to Assume or Reject Nonresidential Lease*, dated Apr. 7, 2009 (ECF Doc. # 24) (main case).)  One of the reasons proffered by Skyline was the uncertainty regarding which of the several amendments and modifications to the original Lease were part of the current Lease.  In particular, Skyline contended that the May 2005 Agreement, or at least certain portions of it, should be rescinded, and asserted a rescission claim in the State Court Action.  According to Skyline's motion, "the Lease itself is complex inasmuch as there are numerous amendments and collateral agreements," (*id.* at ¶ 11), "there are disputes as to which of the agreements are enforceable as part of the Lease and which are not," (*id.* at ¶ 12), and "the nature of the Debtor's plan is contingent upon the Debtor's assumption or rejection of the Lease, and that decision is in large part contingent upon the progress of the ESB litigation."  (*Id.* at ¶ 26.)  In other words, the claims asserted in the parties' lawsuits, or at least some of those claims, had to be decided first before Skyline could exercise its business judgment and decide whether to assume or reject the Lease.

The motion to extend the time to assume or reject and to extend exclusivity, and the motion to remand and abstain were argued on the same day.  The Court granted the first motion.

5

(*Order Extending Time to Assume or Reject Nonresidential Lease and Extending Debtor's Exclusive Periods to File a Plan and Solicit Acceptances*, dated June 15, 2009 (ECF Doc. # 33) (main case).)  As to the remand/abstention motion, it appeared, as Skyline argued, that the claims in the adversary proceedings were intertwined with Skyline's decision to assume or reject the Lease.  For example, the rescission claim, if successful, would define the extent of the Lease that Skyline would be assuming as well as the monetary obligations imposed under the May 2005 Agreement that Skyline would have to cure.  Similarly, ESB asserted a claim for attorneys' fees under the Lease and License in the ESB Action, and Skyline would also have to cure these costs if it assumed the Lease and License.  Given the clear connection between the litigations and Skyline's decision to assume or reject its agreements with ESB, a connection that Skyline highlighted, the Court denied the remand and abstention motions noting that certain of the claims "arguably, they may be core proceedings."[3]  (Transcript of the hearing held Apr. 28, 2009 ("Tr. (4/28/09)"), at 26 (ECF Doc. # 30) (main case).)

Surprisingly, only three months later and before any of the Lease issues had been decided, Skyline moved to assume the Lease.  (*See Motion to Assume Lease*, dated July 20, 2009 (ECF Doc. # 38) (main case).)  The motion was eventually clarified to include the License, (*Stipulation & Order*, dated July 27, 2009, at ¶ 1 (ECF Doc. # 44) (main case)), and following an evidentiary hearing and over ESB's objection, the Court granted the assumption motion.  (*Order Granting Motion to Assume Lease,* dated Sept. 17, 2009 ("*Assumption Order*") (ECF Doc. # 57)

---

[3]        During the argument, Skyline's counsel conceded that at least some of the claims asserted in the adversary proceedings were core.  (Tr. 4/28/09 at 24.)

6

(main case).)  The *Assumption Order* also encompassed the May 2005 Agreement.  *Prior Decision*, 432 B.R. at 80.[4]

With this background, I turn to Skyline's jurisdiction-related objections.  Skyline maintains that I should now grant the remand/abstention motion I previously denied for two reasons.  First, even if the Court previously had subject matter jurisdiction, it now lacks post-confirmation subject matter jurisdiction because the plan was confirmed, and the case has been fully administered.  (*New York Skyline, Inc.'s Memorandum of Law in Opposition to the Motion of Empire State Building L.L.C., Empire State Building, Inc. and Empire State Building Associates, L.L.C. for Summary Judgment and/or Dismissal*, dated Aug. 19, 2011 ("*Skyline Opposition*")*,* at 14-16 (ECF Doc. # 65).)  Second, the Supreme Court's decision in *Stern v. Marshall* deprives this Court of the power to decide purely state law claims, but in any event, the procedures required by *Stern v. Marshall* will lead to delay.  (*Id.* at 16-20.)

### 1.    Subject Matter Jurisdiction

A court's subject matter jurisdiction is determined at the time that the action is commenced, and subsequent events do not affect it.  *Freeport–McMoRan, Inc. v. K N Energy, Inc.*, 498 U.S. 426, 428 (1991) ("We have consistently held that if jurisdiction exists at the time an action is commenced, such jurisdiction may not be divested by subsequent events."); *Certain Underwriters at Lloyd's, London v. ABB Lummus Global, Inc.*, 337 B.R. 22, 25 (S.D.N.Y. 2005) (same).  Subject matter jurisdiction over a removed claim is also determined by the facts existing at the time of removal.  *In re WorldCom, Inc. Secs. Litig.*, 294 B.R. 553, 556 (S.D.N.Y. 2003).

---

[4]     The assumption of the May 2005 Agreement provided one of the grounds for granting ESB's motion for summary judgment dismissing Skyline's rescission claim.  *Prior Decision*, 432 B.R. at 82.

Even the dismissal of the underlying bankruptcy case does not automatically deprive the bankruptcy court of jurisdiction to determine pending matters. *Porges v. Gruntal & Co. (In re Porges)*, 44 F.3d 159, 162 (2d Cir. 1995) ("[N]othing in the Bankruptcy Code requires a bankruptcy court to dismiss related proceedings automatically following the termination of the underlying case.").

At the time that the State Court Action was removed and the ESB Action was commenced in this Court, the claims and counterclaims asserted, at a minimum, "related to" or were non-core claims in Skyline's bankruptcy case. Skyline was a party to each of the claims and counterclaims, and their resolution would have a "conceivable effect" on Skyline's estate. *See Publicker Indus., Inc. v. United States (In re Cuyahoga Equip. Corp.)*, 980 F.2d 110, 114 (2d Cir. 1992). Neither the confirmation of Skyline's plan nor anything else that subsequently occurred deprived this Court of its subject matter jurisdiction over those claims and counterclaims. Skyline's reliance on cases that concerned the commencement of post-confirmation litigation is misplaced.

### 2. *Stern v. Marshall*

The Supreme Court's decision in *Stern v. Marshall*, 131 S. Ct. 2594 (2011), does not affect the jurisdictional analysis or alter the conclusion that the litigations should stay here. In *Stern*, the Court concluded on the facts presented that even though 28 U.S.C. § 157 denominated as "core" counterclaims asserted by the estate against creditors that filed proofs of claim, and further, authorized the bankruptcy court to enter a final judgment with respect to those counterclaims, the final judgment on the counterclaim in that case could not be entered by a non-Article III court. *Id.* at 2618. The holding in *Stern* did not concern the subject matter

8

jurisdiction of the bankruptcy court, but rather, the allocation of the authority as between the

district court and the bankruptcy court to enter final judgments. *Id.* at 2607 ("Section 157

allocates the authority to enter final judgment between the bankruptcy court and the district

court. *See* §§ 157(b)(1), (c)(1). That allocation does not implicate questions of subject matter

jurisdiction."); *Ace Am. Ins. Co. v. DPH Holdings Corp. (In re DPH Holdings Corp.)*, 448 Fed.

Appx. 134, 136 (2d Cir. 2011) ("Whether a proceeding is core or non-core is beside the point for

determining jurisdiction because '[t]hat allocation [of core and non-core] does not implicate

questions of subject matter jurisdiction.' [quoting *Stern*, 131 S. Ct. at 2607.] "So long as a

proceeding is one or the other, the Bankruptcy Court possessed subject-matter jurisdiction.").

        Moreover, *Stern* addressed the specific problem of an Article I court's authority to enter a

final judgment in proceedings denominated by statute as core, and *had nothing* to do with non-

core proceedings. With a few exceptions, the remaining claims asserted by Skyline and ESB are

non-core; they arise from the parties' pre-petition agreements, and are based on state law. The

Court has the authority to enter a final judgment on these claims because the parties have

expressly consented. *See* 28 U.S.C. § 157(c)(2) (authorizing the bankruptcy court to hear and

determine a "related to" proceeding with the consent of all parties). ESB consented in a letter to

the Court dated August 11, 2011. (ECF Doc. # 63.) Skyline consented under the *Debtor's*

*Fourth Amended Plan of Reorganization*, filed Aug. 13, 2010 (the "*Plan*") (ECF Doc. # 132)

(main case), signed by Skyline's president and its counsel, (*id.* at 31), and ultimately confirmed

by the Court. (*Order Confirming Debtor's Fourth Amended Plan of Reorganization*, dated Oct.

12, 2010 (ECF Doc. # 144) (main case).)

9

Article 11 of the *Plan* deals with the Court's post-confirmation jurisdiction. It provides, in pertinent part, that that the Court will have jurisdiction, *inter alia*, "[t]o determine any and all adversary proceedings, applications, and contested matters that are pending on the Effective Date," (*Plan* at § 11.1(b)), and "[t]o hear, determine and enforce all Claims and causes of action which may exist on behalf of the Debtor or the Debtor's Estate, including, but not limited to, any right of the Debtor or the Debtor's Estate to recover assets pursuant to the provisions of the Bankruptcy Code." (*Id.* at § 11.1(j).) Nothing compelled Skyline to include these provisions in the *Plan*. Separately and in combination, they reflect Skyline's consent to this Court's authority to hear and determine, and enter final judgments in connection with, all of the claims asserted in the State Court Action and the ESB Action which were pending on the date of confirmation.[5]

The same reasoning applies to ESB's core claim for attorneys' fees, but even without the parties' consent, the Court has authority to render a final judgment on that claim. When Skyline assumed the Lease and License, it was required to cure its pre-petition defaults. *See* 11 U.S.C. § 365(b)(1)(A). As discussed, ESB had a right to attorneys' fees under the Lease and License; its unpaid claims were pre-petition defaults disputed by Skyline. At the assumption hearing, the parties agreed that they would litigate the attorneys' fees as part of the trial in the adversary proceeding, (Transcript of the hearing held Aug. 5, 2009, at 10-11 (ECF Doc. # 55) (main case)), and the *Assumption Order* directed Skyline to escrow the money to pay the attorneys' fee claim.[6]

---

[5]    Skyline contends that a party cannot confer subject matter jurisdiction by consent. The *Plan* does not constitute Skyline's consent to subject matter jurisdiction over pending claims that otherwise fall outside the Court's jurisdiction. Instead, Article 11 constitutes Skyline's consent to the Court's authority to enter a final judgment in connection with pending claims over which it has subject matter jurisdiction.

[6]    The *Assumption Order* required Skyline to "escrow $768,170.76 as and for disputed cure amounts pending further order of this Court." (*Assumption Order* at 2). The schedule attached to the *Assumption Order* identified the disputed and undisputed cure claims. The disputed cure claims specifically included security charges, access fees,

Although ESB's claim to attorneys' fees is based on contract, the assumption motion was a core matter, *see Cibro Petroleum Prods., Inc. v. City of Albany (In re Winimo Realty Corp.)*, 270 B.R. 108, 121 (S.D.N.Y. 2001); *In re Texaco, Inc.*, 77 B.R. 433, 437 (Bankr. S.D.N.Y. 1987), and the right to a prompt cure of prepetition defaults is, at bottom, part of the claim allowance process which is fundamentally core.  A bankruptcy court can, therefore, render a final judgment as to those cure costs.

Finally, to the extent that Skyline appears to be asking the Court to reconsider its prior decision not to remand or abstain, I note that Skyline has not made such a motion, and even if it had, the motion to reconsider would be untimely (by nearly 3 years).  Accordingly, the Court concludes that it has subject matter jurisdiction over the claims and counterclaims asserted in the State Court Action and the ESB Action, and has the authority to hear and determine and enter a final judgment on each of those claims.

**B.      The Motion for Summary Judgment**

**1. Introduction**

Rule 56 of the Federal Rules of Civil Procedure, made applicable to this adversary proceeding by FED. R. BANKR. P. 7056, governs summary judgment motions.  "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material

---

electrical charges, late fees and attorneys' fees.  It appears, however, that the only remaining monetary claim asserted by ESB relates to attorneys' fees.

11

fact and the movant is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(a).[7]  The

moving party bears the initial burden of showing that the undisputed facts entitle him to

judgment as a matter of law.  *Rodriguez v. City of New York*, 72 F.3d 1051, 1060-61 (2d Cir.

1995).  Where the non-moving party would have the burden of proof at trial, the movant may

obtain summary judgment by showing that "little or no evidence may be found in support of the

nonmoving party's case."  *Gallo v. Prudential Residential Servs., L.P.*, 22 F.3d 1219, 1123-24

(2d Cir. 1994); *accord Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).

       If the movant carries this initial burden, the nonmoving party must set forth specific facts

that show triable issues, and cannot rely on pleadings containing mere allegations or denials.

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986); *see Celotex

Corp.*, 477 U.S. at 324.  In deciding whether material factual issues exist, all ambiguities must be

resolved and all inferences must be drawn in favor of the nonmoving party.  *Matsushita*, 475

U.S. at 587.

## 2.      Attorneys' Fees

       Count XI of the complaint filed in the ESB Action (the "*ESB Complaint*") (ECF Doc. #

1) (Adv. Proc. # 09-1107) seeks to recover attorneys' fees ESB incurred commencing and

prosecuting the ESB Action as well as the fees incurred in connection with the State Court

Action.  (*Reply Memorandum of Law*, dated Sept. 16, 2011, at 14-15 (ECF Doc. # 70).)  ESB

---

[7]      ESB's motion is governed by the amendments to Rule 56 that became effective on December 1, 2010.
Although some language has changed, the standard for granting summary judgment remains unchanged and the
amendments will not "affect continuing development of the decisional law construing and applying these phrases."
FED. R. CIV. P. 56 advisory committee's note (2010).

acknowledges that the amount of the fees is disputed, and its motion is limited to seeking partial summary judgment on the issue of Skyline's liability.

Article 5 of the original Lease states that if Skyline "shall at any time default hereunder, and if [ESB] shall institute an action or summary proceeding against [Skyline] based upon such default, then [Skyline] will reimburse [ESB] for the expense of reasonable attorneys' fees and disbursements thereby incurred by [ESB]."[8]  Similarly, the License states: "If Licensee shall at any time default hereunder, and if Licensor shall institute an action against Licensee based upon such default, then Licensee will reimburse Licensor for the expense of reasonable attorney's fees and disbursements incurred by Licensor in connection with such default."  (*Halligan Aff.* Ex. G, Art. 11.)  In order for a landlord to recover its attorneys' fees under such a provision, it must prevail on its claim that the tenant defaulted under the lease.  1 HON. ROBERT F. DOLAN, RASCH'S NEW YORK LANDLORD AND TENANT, INCLUDING SUMMARY PROCEEDINGS § 12:6, at 527 (4d ed. 1998) ("RASCH").

Counts II through X in the ESB Complaint sought declaratory and equitable relief based upon alleged violations of the Lease and License.  ESB dismissed Counts II through V without prejudice, and does not seek to recover attorneys' fees that it incurred in pursuing them. (*Memorandum of Law of Empire State Building Company L.L.C., Empire State Building, Inc., and Empire State Building Associates L.L.C. in Support of Their Motion for Summary Judgment on Count XI of their Complaint, on Their Second Counterclaim, and on New York Skyline, Inc.'s*

---

[8]      A copy of the original Lease is annexed as Exhibit F to the *Affidavit of Rosemary Halligan*, sworn to July 15, 2011 ("*Halligan Affidavit*") (ECF Doc. # 57).

13

*Fourteenth, Fifteenth And Eighteenth Claims for Relief in Their Entirety*, dated July 15, 2011

("*ESB Memo*"), at 7 n.3 (ECF Doc. #59).)

Counts VI through IX asserted claims for specific performance and injunctive relief

relating to the absence of certain disclaimer language on Skyline's tickets, website and

advertising. The Lease requires that "all tickets used by customers visiting the Attraction shall

be imprinted on the reverse side thereof with such language as Landlord shall from time to time

require explaining that Tenant is not affiliated with Landlord . . . ." (Article 44(B)(1)(k).)

According to ESB, the disclaimer was missing. (*ESB Complaint* at ¶ 81.) Moreover, the

Debtor's flyers, brochures and advertising did not include the disclaimer, required under the May

2005 Agreement to the effect that "New York SkyRide Theater is an independent business and is

not affiliated with the owner of the Empire State Building or the Observatory at the top of the

Empire State Building." (May 2005 Agreement at ¶ 9.)[9] Finally, Skyline's website and the

brochure contained on the website did not contain this disclaimer. (*ESB Complaint* at ¶ 82.)

Count X asserted a claim for specific performance based upon Skyline's failure to

remove three outstanding violations on the premises issued by the Fire Department of New York.

(*Id.* at ¶¶ 85, 151.) According to ESB, the violations related to the failure to maintain a public

assembly permit. (*ESB Memo* at 7.) The Lease requires Skyline to "comply with all laws, orders

and regulations of any governmental authority having or asserting jurisdiction over the Premises,

which shall impose any violation, order or duty upon Lessor or Lessee with respect to the

premises or the use or occupancy thereof . . . ." (Lease, ¶ 14(a); *see also* Lease, ¶ 44(B)(1)(e)

---

[9]     The May 2005 Agreement is attached as Exhibit N to the *Halligan Affidavit*.

14

(Debtor must "comply with all requirements of law . . .").)  Skyline has not disputed ESB's position that the clause would require it to remedy a Fire Department violation.

ESB's proof supports its claims under Counts VIII and IX, and accordingly, it has demonstrated its right to attorneys' fees based on Skyline's default.  These counts pertain to the ticket disclaimer.  During a hearing held on June 16, 2011, Skyline conceded that its agreement with ESB required these disclaimers, and they did not appear on the tickets.  (*See* Transcript of the hearing held June 16, 2011, at 6-9 (ECF Doc. # 74).)  Although Skyline's concession did not refer to the state of facts immediately prior to the commencement of the ESB Action, Skyline indicated that it was using up an old batch of "disclaimer-less" tickets, and would include the disclaimer when it ordered the next batch.  (*Id.* at 5.)  This implied that the default was ongoing, dating back at least to the May 2005 Agreement.

In its defense, Skyline contends that ESB cannot recover attorneys' fees in connection with the ticket disclaimer claim because it was settled and not litigated to a conclusion.  After the June 16, 2011 hearing, the parties entered into a Stipulation and Order, dated July 5, 2011 ("*Stipulation & Order*") (ECF Doc. # 53).)  Paragraph 2 memorialized the agreement concerning how Skyline would cure its failure to include the ticket disclaimers.  The settlement gave ESB the full extent of the declaratory relief and specific performance it could have obtained if it had litigated this issue and prevailed.  Thus, it prevailed on the "central relief sought" through the *Stipulation & Order*, and is entitled to attorneys' fees to the same extent as if it had litigated the claim to a successful conclusion.  *See Acierno v. Faldich*, 782 N.Y.S.2d 509, 510 (N.Y. Sup. Ct. 2004).

15

While the foregoing is sufficient to establish Skyline's liability for attorneys' fees in some amount, I conclude that the right to attorneys' fees with respect to Count X has not been established as a matter of law.  It is true that Skyline admitted that "[t]he FDNY violation due to Skyline's public assembly permit was removed in February 2011."  (*Compare [ESB's] Statement of Undisputed Facts*, dated July 15, 2011 ("*ESB's Rule 7056-1 Statement*"), at ¶ 36 (ECF Doc. # 56) *with New York Skyline, Inc.'s Local Rule 7056.1(c) Statement*, dated July 24, 2009 [*sic*] ("*Skyline's Rule 7056-1 Statement*"), at ¶ 36 (ECF Doc. # 64).)  Hence, it conceded that for some period prior to February 2011, it was in violation of New York Fire Department regulations relating to public assembly permits.

Nevertheless, the evidence did not establish that these violations are the same violations referred to in the ESB Complaint beyond the statement in ESB's moving brief.  Furthermore, these violations were not expressly dealt with in the *Stipulation & Order*, although this may be because ESB dismissed Count X one month earlier in the *Joint Final Pre-Trial Order*, dated June 16, 2011 ("*JPTO*"), at ¶ 2(a)(xxi) (ECF Doc. # 48), possibly as a result of the removal of the violation.  In short, ESB has failed to show that it is entitled to judgment as a matter of law on this aspect of its claim for attorneys' fees.

Once ESB met its *prima facie* burden of demonstrating Skyline's liability for attorneys' fees on the ticket disclaimer claims,[10] the burden shifted to Skyline to show a material issue of fact or a defense to the claim.  Skyline makes several arguments regarding why ESB cannot

---

[10]     Skyline contends that ESB failed to show that it incurred any attorneys' fees recoverable under the Lease and License.  ESB obviously incurred fees attributable to Counts VIII and IX; it drafted the ESB Complaint and took other actions, including the execution of the *Stipulation & Order*.  The amount of the fees, however, must be determined following the trial.

16

recover attorneys' fees, (*see Skyline Opposition* at 21-26), some of which pertain to all of ESB's claims and counterclaims and others of which only apply to the ESB Counterclaims.

In the first category, Skyline argues that ESB cannot recover attorneys' fees because it is not seeking to recover possession or reenter the premises, but instead, is requesting declaratory relief and specific performance. (*Id.* at 22-25.) ESB's right to recover attorneys' fees is not, however, limited to situations in which it seeks to reenter the premises or dispossess Skyline. The relevant provisions of the Lease (and License) permit ESB to recover attorneys' fees if it commences a proceeding as a result of Skyline's default,[11] and courts have upheld the right to recover attorneys' fees under similar provisions when the landlord seeks only declaratory or injunctive relief. *See In re Westview 74th St. Drug Corp.*, 59 B.R. 747, 757 (Bankr. S.D.N.Y. 1986) (examining relevant lease provision and contrasting it with provision in *Frank B. Hall & Co. of New York, Inc. v. Orient Overseas Assocs.,* 446 N.Y.S.2d 59 (N.Y. App. Div.), *aff'd*, 439 N.E.2d 395 (N.Y. 1982) which required the landlord to undertake affirmative action to reenter the premises or dispossess the tenant); *Allerand, LLC v. 233 East 18th St. Co., LLC.*, 798 N.Y.S.2d 399, 401 (N.Y. App. Div. 2005) (attorneys' fees recoverable in declaratory judgment action); *Duane Reade v. 405 Lexington, L.L.C.*, 798 N.Y.S.2d 393, 394 (N.Y. App. Div. 2005) (attorneys' fees recoverable in connection with landlord's counterclaim for injunctive and declaratory relief). In addition, although the Lease's attorneys' fees provision is included in a paragraph entitled "RELETTING, ETC.," Article 40 of the Lease states that the captions are included for convenience only, and are not to be construed as part of the Lease as a limitation on the scope of any of its provisions.

---

[11]    Skyline's argument also makes no sense in connection with the right to attorneys' fees under the License.

Skyline also contends that ESB cannot recover its attorneys' fees because none of its claims involve a "breach of a basic obligation of the lease."  (*Skyline Opposition* at 24) (citing *Allerand LLC,* 798 N.Y.S.2d 399.)  The attorneys' fee provision in the Lease is not limited to defaults involving basic lease obligations.  Furthermore, although the cases cited by Skyline use this or similar phrases, they do not stand for the proposition that the landlord can recover attorneys' fees only when the tenant breaches a basic obligation under the lease.

The ESB Counterclaims are a different story.  Initially, Skyline's argument that the assertion of a counterclaim in an action commenced by Skyline does not equate to the institution of an action within the meaning of the attorneys' fees provisions, (*see id.* at 21), lacks merit.  Although there is older contrary authority, the more recent trend permits a landlord to recover attorneys' fees under similar provisions where the tenant commences the proceeding and the defendant-landlord asserts counterclaims based on the tenant's default.  *See Duane Reade v. York Towers, Inc.*, 802 N.Y.S.2d 401, 402 (N.Y. App. Div. 2005) ("Plaintiff's obligation to reimburse the landlord for the expenses occasioned by its default is unaffected by the circumstance that it initiated the litigation in which the landlord's claims for reimbursement were eventually asserted."); *Duane Reade v. 405 Lexington, L.L.C.*, 798 N.Y.S.2d at 394 ("Inasmuch as the landlord was effectively compelled to seek relief against plaintiff through the assertion of counterclaims, plaintiff cannot reasonably complain that the landlord is not entitled to counsel fees merely because it had not affirmatively initiated its own legal proceeding to enforce the leases."); *Huron Assocs., LLC v. 210 East 86th St. Corp.*, 794 N.Y.S.2d 360, 361 (N.Y. App. Div. 2005) (reinstating the defendant-landlord counterclaim for attorneys' fees relating to the plaintiff-tenant's breach of the lease); *but see H. L. Klion, Inc. v. Venimore Bldg. Corp.*, 249

18

N.Y.S.2d 910, 911 (N.Y. App. Div.) ("[W]e do not believe defendant was entitled to the award

of [attorneys' fees because] we do not find . . . the defendant's assertion of its counterclaim for

declaratory judgment and its counterclaim for additional rent because of increases in taxes was

the equivalent of the institution by defendant of 'an action or summary proceeding against the

Tenant based upon * * * default' of the tenant."), *aff'd in part & modified in part*, 203 N.E.2d

651 (N.Y. 1964).

ESB's objection based on the splitting of the cause of action for attorneys' fees is more

significant.  ESB asserted a claim for attorneys' fees in the ESB Action, but it did not include a

counterclaim for attorneys' fees in the State Court Action.  A claim for attorney's fees is an

additional rent obligation that is interrelated with the claim for breach of the lease and constitutes

a single cause of action.  1 RASCH § 12:6, at 527.  Accordingly, the landlord must assert the

claim for attorneys' fees in the same litigation in which it asserts a claim based on a breach of the

lease.  *E.g., 930 Fifth Corp. v. King*, 366 N.E.2d 875, 876 (N.Y. 1977); *Wavertree Corp. v. 136

Waverly Assocs.*, 685 N.Y.S.2d 693, 694 (N.Y. App. Div. 1999).  Furthermore, the rule is not

limited to prior litigation involving claims for unpaid rent, and applies to prior litigation

involving non-financial defaults as well.  *See 930 Fifth Corp.*, 366 N.E.2d at 876 (landlord's

failure to seek attorneys' fees in prior proceeding involving a violation of the house rules

regarding pets precludes the landlord from bringing a subsequent action to recover the attorneys'

fees incurred in the prior proceeding).

Although ESB correctly contends that the two adversary proceedings have been treated as

one for procedural purposes, they are still separate lawsuits subject to the rules relating to the

splitting causes of action.  *815 Park Ave. Owners, Inc. v. Metzger*, 672 N.Y.S.2d 860 (N.Y. App.

19

Div. 1998), which ESB cites in opposition, is not contrary.  There, a cooperative apartment corporation sued a tenant/shareholder for unpaid monthly maintenance arrears and also asserted a claim for attorneys' fees.  After the plaintiff obtained a judgment on its cause of action for maintenance arrears and the defendant satisfied it, the court severed the claim for attorneys' fees. *Id.* at 861.  The defendant apparently argued that the judgment was *res judicata, i.e.*, it extinguished the claim for attorney fees.  *See id.*

The court rejected the defendant's argument, and ruled that although the claims were interrelated they were clearly distinct, and noted the common practice to sever the derivative claim for attorneys' fees upon granting judgment on the main claim.  *Id.*  In other words, the adjudication of the main claim followed by the severance and adjudication of the attorneys' fees claim is permissible provided that both claims are asserted in the same action.  If the attorneys' fees claim is not asserted in the same action as the main claim, there is nothing to sever or try.

ESB makes the related argument that the rule against splitting a cause of action for attorneys' fees from the main claim only applies when the merits of the prior action were litigated to a conclusion.  (*Reply Memorandum of Law of Empire State Building Company L.L.C., Empire State Building, Inc., and Empire State Building Associates L.L.C. in Further Support of Their Motion for Summary Judgment on Count XI of their Complaint, on Their Second Counterclaim, and Dismissing New York Skyline, Inc.'s Fourteenth, Fifteenth And Eighteenth Claims for Relief in Their Entirety*, dated Sept. 16, 2011 ("*ESB Reply*"), at 15 (ECF Doc. # 70).)  It is true that in order for the landlord to recover its attorneys' fees, it must prevail on its claim that the tenant defaulted under the lease.  1 RASCH § 12:6, at 527.  Furthermore, as *815 Park Ave. Owners* explained, it is permissible to first resolve the main claim, and if decided

20

in the landlord's favor, to sever and then decide the claim for attorneys' fees.  Nevertheless, as in

*815 Park Ave. Owners*, the landlord must assert the claim for attorneys' fees in the same

proceeding as the lease default claims.

Accordingly, ESB is not entitled to recover attorneys' fees in connection with the

prosecution of the ESB Counterclaims.  Although the parties have not discussed the issue, it

would appear that ESB is also not entitled to recover attorneys' fees for defending Skyline's

affirmative claims.  Defensive litigation is not covered by the pertinent Lease and License

provisions.  Moreover, some of Skyline's claims are based on tort and were not even brought

under the Lease and License.

### 3.      Incentive Compensation

The second ESB Counterclaim seeks a permanent injunction based, *inter alia*, on

Skyline's alleged violation of paragraph 7(d) of the May 2005 Agreement.  The latter states that

"[a]ll NYSR [Skyline] employees and representatives who work in the NYSR Premises or in any

area of or near the Building (including without limitation the Visitor Center) in the course of

performing NYSR-related duties . . . [m]ust be salaried employees and not working on

commission or other sales incentive."  The parties agree that this provision was intended to

prevent hard sell tactics by an employee whose compensation depended on the number of tickets

he sold.  Skyline admits that it has paid certain independent contractors on a commission basis,

but denies that they work within the geographic limits set out in the May 2005 Agreement, that

is, at or near the Building.  The location of these so-called "hawkers" is a question of fact not

ripe for determination in the current motion.

Skyline also admits, however, that it pays discretionary monthly bonuses to employees who work at or near the Building.  According to Skyline, the payment of a bonus "is dependent on factors that an individual salesperson cannot control, including whether ESB sells Skyline tickets, whether tour operators and travel agents sell group tickets, whether Skyline promotional activities are successful, and whether customers buy tickets through Skyline's web site or at Skyline's box office." (*Skyline's Rule 7056-1 Statement* at ¶ 17.)  Furthermore, "Skyline's monthly attendance figures are dependent, in addition to tickets sales by ESB and Skyline ticket agents, by group sales (i.e., tickets sold through travel agents, tour operators as well as groups that contact Skyline directly); Skyline's internet sales; sales via numerous travel-related internet web sites (such as Expedia, Wiretown, etc.); Skyline advertising in newspapers, brochures, handouts; Skyline promotional activities (e.g., tie-ins with Long Island Railroad, MetroNorth and New Jersey Transit); and direct sales at Skyline's box office at the Empire State Building." (*Id.* at ¶ 18.)  The question raised by the motion is whether paragraph 7(d) prohibits Skyline from paying a discretionary monthly bonus to its on-site employees which is based, at least in part, on its revenues.

When asked to interpret contractual language on a motion for summary judgment, the question is "whether the contract is unambiguous with respect to the question disputed by the parties." *Law Debenture Trust Co. v. Maverick Tube Corp.*, 595 F.3d 458, 465 (2d Cir. 2010) (quoting *Int'l Multifoods Corp. v. Commercial Union Ins. Co.*, 309 F.3d 76, 83 (2d Cir. 2002)); *Cont'l Ins. Co. v. Atl. Cas. Ins. Co.*, 603 F.3d 169, 180 (2d Cir. 2010).  This presents a question of law.  *Maverick Tube*, 595 F.3d at 465.  A contract is ambiguous if it "could suggest more than one meaning when viewed objectively by a reasonably intelligent person who has examined the

22

context of the entire integrated agreement and who is cognizant of the customs, practices, usages and terminology as generally understood in the particular trade or business." *Int'l Multifoods*, 309 F.3d at 83 (internal quotation marks omitted); *Cont'l Ins. Co.*, 603 F.3d at 180; *Maverick Tube*, 595 F.3d at 466. "[E]vidence outside the four corners of the document as to what was really intended but unstated or misstated is generally inadmissible to add to or vary the writing." *Maverick Tube*, 595 F.3d at 466 (quoting *W.W.W. Assocs., Inc. v. Giancontieri*, 566 N.E.2d 639, 642 (N.Y. 1990)).

"Language whose meaning is otherwise plain does not become ambiguous merely because the parties urge different interpretations in the litigation," *Hunt Ltd. v. Lifschultz Fast Freight, Inc.*, 889 F.2d 1274, 1277 (2d Cir. 1989), unless each is a "reasonable" interpretation. *Seiden Assocs., Inc. v. ANC Holdings, Inc.*, 959 F.2d 425, 428 (2d Cir. 1992); *accord Maverick Tube*, 595 F.3d at 467; *see Readco, Inc. v. Marine Midland Bank*, 81 F.3d 295, 299 (2d Cir. 1996) ("no ambiguity exists where the alternative construction would be unreasonable"). Furthermore, a contract is not ambiguous where the interpretation urged by one party would "strain[ ] the contract language beyond its reasonable and ordinary meaning." *Bethlehem Steel Co. v. Turner Constr. Co.*, 141 N.E.2d 590, 593 (N.Y. 1957); *accord Maverick Tube*, 595 F.3d at 467. "[I]f the agreement on its face is reasonably susceptible of only one meaning, a court is not free to alter the contract to reflect its personal notions of fairness and equity." *Greenfield v. Philles Records, Inc.*, 780 N.E.2d 166, 171 (N.Y. 2002); *accord Maverick Tube*, 595 F.3d at 468.

ESB takes the position that the May 2005 Agreement absolutely prohibits any compensation based on ticket sales. Skyline contends that the provision only prohibits compensating employee ticket sellers on an individual commission basis based upon the number

23

of sales that employee makes.  I conclude that both interpretations are reasonable, and the provision is, therefore, ambiguous.

A "commission" refers to "a fee paid to an agent or employee for transacting a piece of business or performing a service . . . *esp[ecially]*: a percentage of the money received in a sale or other transaction paid to the agent responsible for the business."  WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY UNABRIDGED 457 (1981) (emphasis in original).  Thus, a "commission" generally refers to the compensation a salesman receives on a particular sale.  On the other hand, a "sales incentive" is broader, and can include the more traditional commission as well as any other monetary or non-monetary consideration based on sales.

"Commissions" and "other sales incentives" arguably capture the type of discretionary bonus that Skyline pays to its on-site employees.  Although no individual employee can directly control his own compensation based on the number of tickets he sells, all employees know that they can indirectly affect their compensation by selling more tickets as a group.  On the other hand, the ESB interpretation would effectively prevent Skyline from ever paying its employees a bonus.  While the payment of a bonus may be based on several criteria, a company's profitability—here, derived from ticket sales—is certainly a significant factor.  Furthermore, as Skyline points out, tickets are sold off-site through the Internet and by tour operators and ticket brokers, and are even sold by ESB employees as part of a package that includes tickets to the Observatory.  It is unreasonable to interpret the May 2005 Agreement to preclude Skyline from basing its bonus decisions on revenues generated by these sales.  In light of the ambiguities

24

inherent in ¶ 7(d) of the May 2005 Agreement, a trial is necessary to resolve its meaning, and

ESB's motion for summary judgment is denied.[12]

---

[12]     Skyline suggests that I should construe any ambiguities against ESB, the drafter of the May 2005 Agreement, under the principle of *contra proferentem*. (*Skyline Opposition* at 30.)  *Contra proferentem* is a rule of last resort, and applies after all other aids to interpretation have been exhausted.  *O'Neil v. Ret. Plan for Salaried Emps. of RKO Gen., Inc.*, 37 F.3d 55, 61 (2d Cir. 1994); *Record Club of Am. Inc., v. United Artists Records, Inc.*, 890 F.2d 1264, 1271 (2d Cir. 1989); *Schering Corp. v. Home Ins. Co.*, 712 F.2d 4, 10 n.2 (2d Cir. 1983).  It is premature to use the rule as a substitute for a trial.

### 4.    Good Faith and Fair Dealing

Skyline's Fourteenth Claim for Relief in its Third Amended Complaint, ("*Skyline Complaint*") (ECF Doc. # 30), alleges that ESB's conduct violated the implied covenant of good faith and fair dealing inherent in the Lease and License, and Skyline is entitled to recover, among other damages, its attorneys' fees incurred dealing with ESB's breaches.[13]  Amplifying the claim in its opposition to ESB's motion, Skyline contends that it is entitled to recover its attorneys' fees because they reflect its consequential damages arising from ESB's bad faith initiation of baseless allegations and proceedings.  (*Skyline Opposition* at 33-34.)  ESB seeks summary judgment, arguing that the claim is a thinly disguised effort to circumvent the American Rule.

New York law implies a covenant of good faith and fair dealing in every contract.  *Times Mirror Magazines, Inc. v. Field & Stream Licenses Co.*, 294 F.3d 383, 394 (2d Cir. 2002); *Carvel Corp. v. Diversified Mgmt. Group, Inc.*, 930 F.2d 228, 230 (2d Cir. 1991); *Dalton v. Educ. Testing Serv.*, 663 N.E.2d 289, 291 (N.Y. 1995).  The covenant encompasses "any promises which a reasonable person in the position of the promisee would be justified in understanding were included," *Times Mirror Magazines*, 294 F.3d at 394 (citation omitted), "a pledge that 'neither party shall do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract,'" *Dalton*, 663 N.E.2d at 291 (quoting *Kirke La Shelle Co. v. Armstrong Co.*, 188 N.E. 163, 167 (N.Y. 1933)), and "[w]here the contract contemplates the exercise of discretion, this pledge includes a promise not to act arbitrarily or irrationally in exercising that discretion."  *Dalton*, 663 N.E.2d at 291.

---

[13]    Skyline has dismissed any claim for damages accruing prior to May 27, 2005.  (*JPTO* at ¶ 2(a)(xii).)

The covenant is not, however, boundless.  It cannot imply terms that "'would be

inconsistent with other terms of the contractual relationship,'" *id.* at 291-92 (quoting *Murphy v.*

*Am. Home Prods. Corp.*, 448 N.E.2d 86, 91 (N.Y. 1983)); *accord Times Mirror Magazines*, 294

F.3d at 394, or create independent obligations beyond those set forth in the contract.  *See Warner*

*Theater Assocs. Ltd. P'ship v. Metro. Life Ins. Co.*, No. 97 Civ. 4914, 1997 WL 685334, at *6

(S.D.N.Y. Nov. 4, 1997) ("The duty of good faith arises only to control how the parties carry out

the rights and duties they have undertaken under the contract; it does not give rise to independent

obligations by itself.") (Sotomayor, D.J.), *aff'd*, 149 F.3d 134 (2d Cir. 1998); *CIBC Bank &*

*Trust Co. Cayman Ltd. v. Banco Cent. do Brasil*, 886 F. Supp. 1105, 1118 (S.D.N.Y. 1995)

("[A]lthough the obligation of good faith is implied in every contract, it is the terms of the

contract which govern the rights and obligations of the parties.") (citation omitted).  Finally, as

even Skyline concedes, New York law does not support a separate claim for the breach of the

implied covenant of good faith and fair dealing when it is based on the same facts as the breach

of contract claim.  (*Skyline Opposition* at 33.)

Initially, ESB contends that the Fourteenth Claim duplicates the Fourth Claim, but I

disagree.  The latter alleges a breach of the May 2005 Agreement relating to the resolution of

disputes, the location of employees, the discipline of employees, the installation of signage and

monitors and the imposition of a security fee.  (*Skyline Complaint* at ¶ 137.)  The thrust of the

Fourteenth Claim is that ESB breached the implied covenant by committing a variety of

harassing acts, including sending baseless notices to cure relating to Skyline's operation of a gift

shop, the sale of prohibited items, (*id.* at ¶ 8), and the sale of tickets to other New York City

tourist attractions, (*id.* at ¶ 9), and its complaints about popcorn odors, advertising activities and

sign stanchions, limiting access to Skyline's customers and prohibiting the use of public

bathrooms by Skyline's invitees.  (*Id.* at ¶ 11.)

That said, under New York law, breach of the implied duty of good faith and fair dealing

"'is merely a breach of the underlying contract.'"  *Fasolino Foods Co. v. Banca Nazionale del*

*Lavoro*, 961 F.2d 1052, 1056 (2d Cir. 1992) (quoting *Geler v. Nat'l Westminster Bank USA*, 770

F. Supp. 210, 215 (S.D.N.Y. 1991) (citations omitted)); *accord Nat'l Mkt. Share, Inc. v. Sterling*

*Nat'l Bank*, 392 F.3d 520, 525 (2d Cir. 2004).  The Fourteenth Claim does not explain how

ESB's conduct constituted a breach of an implied covenant under the Lease, but suggests that

ESB exercised its remedies under the Lease in bad faith, *i.e.*, by committing a bad faith breach of

contract.

This claim does not escape the limitation imposed by the American Rule which requires

each party to bear its own legal fees unless an agreement, a statute or a court rule provides

otherwise.  *Oscar Gruss & Son, Inc. v. Hollander*, 337 F.3d 186, 199 (2d Cir. 2003); *Hooper*

*Assocs., Ltd. v. AGS Computers, Inc.*, 548 N.E.2d 903, 904 (N.Y. 1989).  The Supreme Court has

recognized three specific exceptions that have also been applied in cases interpreting New York

law:  "(1) when a statute or enforceable contract provides for attorneys' fees; (2) where the

prevailing party confers a common benefit upon a class or fund, and (3) when a losing party

willfully disobeys a court order or has 'acted in bad faith, vexatiously, wantonly, or for

oppressive reasons.'"  *V.S. Int'l, S.A. v. Boyden World Corp.*, No. 90 Civ. 4091 (PKL), 1993 WL

59399, at *13 (S.D.N.Y. Mar. 4, 1993) (quoting *Alyeska Pipeline Serv. Co. v. Wilderness Soc'y*,

421 U.S. 240, 257-59 (1975)).  Accordingly, there is no right to attorneys' fees for an ordinary

breach of contract claim under New York law, *U.S. Naval Inst. v. Charter Commc'ns*, 936 F.2d

692, 698 (2d Cir. 1991) (citing *Alyeska Pipeline Serv. Co.,* 421 U.S. at 247), unless the party

seeking fees can establish one of the three exceptions.

Here, the first two exceptions do not apply. No statute authorizes Skyline to recover its

legal fees. Furthermore, the Lease and License provide that ESB can recover attorneys' fees

under certain circumstances, but do not contain a similar provision for Skyline. Nor has Skyline

conferred a benefit upon a class or fund. Rather, Skyline relies on ESB's alleged bad faith to

recover attorneys' fees for conduct that New York law deems a breach of the underlying

contract.

The bad faith exception to the American Rule is rooted in the court's inherent power to

supervise and control its own proceedings. *Oliveri v. Thompson*, 803 F.2d 1265, 1272 (2d Cir.

1986). A party is not entitled to attorneys' fees on grounds that a party's business conduct was

"larcenous," "nefarious," "villain[ous]" or simply "[o]ld fashioned piracy." *Dow Chem. Pac.*

*Ltd. v. Rascator Mar. S.A.*, 782 F.2d 329, 344 (2d Cir. 1986). In applying the bad faith

exception, the appropriate focus for the court is

> the conduct of the party in instigating or maintaining the litigation, for an
> assessment of whether there has been substantive bad faith as exhibited by, for
> example, its pursuit of frivolous contentions, or procedural bad faith as exhibited
> by, for example, its use of oppressive tactics or its willful violations of court
> orders.

*Id.* at 345; *accord Centex Corp. v. United States*, 486 F.3d 1369, 1372 (Fed. Cir. 2007)

("[A]uthorizing a court to shift fees based solely on bad faith conduct that forms the basis

for the substantive claim for relief would undermine the American Rule by penalizing a

party who raises good faith defenses to claims of liability for bad faith conduct.")

(collecting cases); *Woods v. Barnett Bank of Fort Lauderdale*, 765 F.2d 1004, 1014 (11th

Cir. 1985) ("The bad faith or vexatious conduct must be part of the litigation process itself."); *Weathertrol Maint. Corp. v. Nova Cas. Co.*, No. 05-21345-CIV-TORRES, 2007 WL 566293, at *4 (S.D. Fla. 2007) ("[T]he American Rule cannot be set aside merely because a case involves a 'bad faith' breach of contract.").

Skyline's Fourteenth Claim, which alleges a bad faith breach of contract, does not satisfy the bad faith exception. And Skyline has not identified any conduct by ESB in connection with the commencement of the ESB Action or the assertion of the ESB Counterclaims, or any conduct during either lawsuit, that constitutes bad faith.

Finally, the two insurance cases that Skyline cites in support of this claim are distinguishable. In *Bi-Economy Mkt., Inc. v. Harleysville Ins. Co. of N.Y.*, 886 N.E.2d 127 (N.Y. 2008), the Court ruled that an insured can recover consequential damages from its insurer based on the insurer's bad faith failure to investigate the claim honestly and pay it promptly. The Court reasoned that an insured bargains for two things: indemnity for loss and the peace of mind that it will be protected in the event of a catastrophe. *Id.* at 131. Limiting the insured's recovery to indemnity for the loss "does not place the insured in the position it would have been in had the contract been performed." *Id.* at 131-32. "When an insured in such a situation suffers additional damages as a result of an insurer's excessive delay or improper denial, the insurance company should stand liable for these damages. This is not to punish the insurer, but to give the insured its bargained-for benefit." *Id.* at 132.

*Panasia Estates, Inc. v. Hudson Ins. Co.*, 886 N.E.2d 135 (N.Y. 2008), decided the same day, also involved an insurer's bad faith investigation of the loss and denial of coverage. *Id.* at 136. The insurer moved for partial summary judgment, arguing that the insured could not

30

recover "consequential, extra-contractual, or incidental damages or attorneys' fees" because, among other things, the contract expressly barred "consequential loss." *Id.* The Supreme Court denied the motion to dismiss the claims for consequential damages, and the Appellate Division and Court of Appeals affirmed. Relying on *Bi-Economy*, the Court ruled that the insured could recover consequential damages resulting from a breach of the covenant of good faith and fair dealing as long as they were within the contemplation of the parties. *Id.* at 137.

These cases stand for the proposition that an insured can recover consequential damages including, possibly, attorneys' fees,[14] based on a bad faith breach by the insurer of the implied covenant of good faith and fair dealing to investigate and promptly pay covered claims. They appear to be limited to the insurance context, and do not support an additional and general exception to the American Rule that a party can recover its attorneys' fees as damages for a breach of contract or a breach of the implied covenant of good faith and fair dealing. Accordingly, ESB is granted partial summary judgment dismissing this claim.

### 5. *Prima Facie* Tort

Skyline's Fifteenth Claim for Relief seeks damages based on ESB's commission of a *prima facie* tort. (*Skyline Complaint* at ¶¶ 204-07.) As amplified in the *Skyline Opposition*, the underlying acts include bogus breach claims relating to rent defaults, the operation of the gift shop and the payment of retroactive security costs, objections to popcorn odors, sales of tourist brochures and "*tchotchkes*," the use of a confidential informant from Skyline's ranks, and ESB's campaign to use the New York Police Department to ticket and arrest Skyline ticket agents.

---

[14] *Bi-Economy* did not even mention attorneys' fees and while *Panasia* identified attorney fees as part of the insured's claim, it did not hold that they were recoverable as consequential damages.

(*Skyline Opposition* at 6-10, 37-38.)  According to Skyline, ESB's actions have been motivated by malice and designed to drive Skyline out of business.  (*Id.* at 35-36.)  ESB seeks summary judgment, mainly asserting a business justification for its acts.  (*See ESB Memo* at 15-18.)

The elements of a claim for *prima facie* tort under New York law are (1) the intentional infliction of harm, (2) resulting in special damages, (3) without excuse or justification, (4) by an act or series of acts that would otherwise be lawful.  *Freihofer v. Hearst Corp.*, 480 N.E.2d 349, 355 (N.Y. 1985); *Smith v. Meridian Tech., Inc.*, 927 N.Y.S.2d 141, 143 (N.Y. App. Div. 2011).  "[T]here is no recovery in prima facie tort unless malevolence is the sole motive for defendant's otherwise lawful act . . . by which is meant that the genesis which will make a lawful act unlawful must be a malicious one unmixed with any other and exclusively directed to injury and damage of another."  *Burns Jackson Miller Summit & Spitzer v. Lindner*, 451 N.E.2d 459, 468 (N.Y. 1983) (internal quotation marks and citations omitted).  "Motives such as profit, self-interest, or business advantage will defeat a *prima facie* tort claim."  *Picture People, Inc. v. Imaging Fin. Servs., Inc.*, 735 F. Supp. 2d 12, 22 (S.D.N.Y. 2010) (internal quotation marks and citations omitted); *accord Squire Records, Inc. v. Vanguard Recording Soc'y, Inc.*, 268 N.Y.S.2d 251, 254 (N.Y. App. Div. 1966) ("Where there are other motives, e.g., profit, self-interest, business advantage, there is no recovery under tort Prima facie."), *aff'd*, 226 N.E.2d 542 (N.Y. 1967).  Meritless or vexatious acts, without more, do not spell out a claim sounding in in *prima facie* tort.  *Howard v. Block*, 454 N.Y.S.2d 718, 719 (N.Y. App. Div. 1982).

Skyline bears the burden of proof on the *prima facie* tort claim.  According to Skyline, the evidence demonstrates ESB's animus toward Skyline, describing it as a "crappy" tenant running a "crappy" operation, liars, cheaters and rule breakers.  ESB has stated that Skyline is

32

not the type of people that ESB wants to do business with, looks forward to the end of the lease

and will not renew it.  (*Skyline Opposition* at 35-36.)  Thus, Skyline argues that there are

questions of fact regarding ESB's motives in complaining about various Lease and License

issues and attempting to use the New York City Police Department to intimidate its ticket agents

and drive them off the street.  (*Id.* at 37.)

   While the evidence confirms that ESB does not consider Skyline a desirable tenant,

Skyline has failed to offer evidence that ESB acted with the "disinterested malevolence" required

to sustain a *prima facie* tort claim.  *Burns Jackson Miller Summit & Spitzer*, 451 N.E.2d at 468.

ESB and Skyline have shared a landlord-tenant relationship since 1993.  The parties have had

their many disputes, and ESB has taken certain actions contrary to Skyline's interests, but

Skyline has not pointed to any action that is inconsistent with ESB's business as a landlord (and

licensor) and its dissatisfaction with Skyline as a tenant (and licensee).  Furthermore, Skyline has

not been evicted or forced out.

   Although Skyline contends that ESB's motives raise a factual issue, (*see Skyline

Opposition* at 37), the argument ignores the testimony of its president, Michael Leeb, that ESB's

motives are economic.  Skyline previously sued the City of New York over the actions of the

New York Police Department relating to the ticketing of Skyline's ticket sellers.  *See New York

Skyline, Inc. v. City of New York*, 939 N.Y.S.2d 42 (N.Y. App. Div. 2012).  Among other things,

Skyline contended that the police acted at ESB's behest, and sought injunctive relief in the

litigation with the City.  Leeb submitted a supporting affidavit that described ESB's recent

actions as part of its continuing campaign to end Skyline's business, (*Affidavit of Michael A.

*Leeb*, sworn to June 13, 2011 ("*Leeb Affidavit*"), at ¶ 12),[15] and offered the motive for ESB's campaign to rid the Building of Skyline:

> It is no secret that the Malkin family is determined to attract what they consider to be higher-end tenants to the Building.  To the Malkins, Skyline's ticket agents and its customers are "riff raff" who tarnish the Buildings image and prevent it from becoming the class-A commercial space the Malkins want it to be.  If ESBC succeeds in destroying Skyline and expelling it from the Building, ESBC is likely to replace Skyline with a new tenant who will pay more rent, and who also will be more in keeping with the upscale image of the Empire State Building the Malkins wish to project.

(*Id.* at ¶ 14.)

In short, Skyline contends that ESB is engaged in a campaign to drive Skyline out of the Building because Skyline has a below market lease and is adversely affecting the image of the Building.  This attributes motives of economic self-interest to ESB's allegedly wrongful conduct, and dooms Skyline's *prima facie* tort claim.

*Meridian Capital Partners, Inc. v. Fifth Ave. 58/59 Acquisition Co. LP*, 874 N.Y.S.2d 440, 441 (N.Y. App. Div. 2009) is directly on point.  There, the tenant alleged that the landlord had unreasonably interfered with its use of the premises and intended to cause the tenant to surrender its valuable leasehold and pay an exorbitant termination fee.  According to the tenant, the landlord's actions were part of a plan to punish the tenant, who held a below market lease, for refusing to agree to an early surrender of the lease that would have permitted the landlord to rent the space at a substantially greater profit.  *Id.* at 441.  The Appellate Division affirmed the lower court order observing that the claim failed to plead a *prima facie* tort.  "Tenant's allegation of landlord's 'disinterested malevolence' is contrary to its allegation of landlord's profit motive in

---

[15]     The *Leeb Affidavit* is attached as Exhibit RR to the *Stewart Certification*.

coercing surrender of the lease." *Id.*; *accord White v. Ivy*, 880 N.Y.S.2d 374, 377-78 (N.Y. App.

Div. 2009) (dismissing *prima facie* tort claim by tenant who alleged that landlord had made false

statements to him to procure free building improvements and profit for herself).

Accordingly, ESB's motion for partial summary judgment dismissing Skyline's Fifteenth

Claim is granted, and it is unnecessary to consider ESB's other arguments in support of

dismissal.

### 6.      Tortious Interference with Contract

Skyline's Eighteenth Claim for Relief asserted against ESB Associates sounds in tortious

interference with a contractual relationship, to wit, the Lease and the License.  According to the

*Skyline Complaint*, ESB Associates and ESB embarked on an improvement program in 2006 to

upgrade the Building with the goal toward "'strategic marketing for higher occupancy with better

credit tenants at increased rents.'"  (*Skyline Complaint* at ¶ 223.)  As part of the improvement

program, Skyline was targeted for alleged lease violations "on the basis of not projecting the

appropriate 'appearance' for Associates' 'upgraded' Building."  (*Id.* at ¶ 224.)

Under New York law, a claim for tortious interference with contract "requires the

existence of a valid contract between the plaintiff and a third party, defendant's knowledge of

that contract, defendant's intentional procurement of the third-party's breach of the contract

without justification, actual breach of the contract, and damages resulting therefrom." *Lama

Holding Co. v. Smith Barney Inc.*, 668 N.E.2d 1370, 1375 (N.Y. 1996); *accord Foster v.

Churchill*, 665 N.E.2d 153, 156 (N.Y. 1996); *Israel v. Wood*, 134 N.E.2d 97, 99 (N.Y. 1956).

Skyline maintains that ESB Associates, a non-party to the Lease and License, induced ESB to breach its agreements with Skyline.[16]

ESB Associates primarily contends that Skyline has failed to identify any evidence that Malkin Holdings LLC ("Malkin Holdings"), the common agent for ESB and ESB Associates, performed any acts as agent for ESB Associates in connection with the operation of the Building. (*ESB Moving Memo* at 18-19.) An understanding of ESB Associates' argument requires a discussion of the overlapping ownership and control of ESB and ESB Associates, and their respective roles relating to the Building. As discussed earlier in this opinion, ESB Associates subleases the Building to ESB, and ESB subleases space in the Building to Skyline. The members of ESB Associates are Peter L. Malkin, Anthony E. Malkin and Thomas N. Keltner, Jr., who are also the members of Malkin Holdings. (*Form 10-K* at 3.)

Malkin Holdings is the Supervisor of ESB and oversees ESB's operation of the Building as well as ESBI, the operator of the observation decks. (Affidavit of Anthony E. Malkin, sworn to July 15, 2011 ("*Malkin Affidavit*"), at ¶ 5 (ECF Doc. # 58).) In addition, Malkin Holdings is the Supervisor of ESB Associates. (*Id.* at ¶ 6.) In short, ESB, ESB Associates and Malkin Holdings are owned or controlled, or both, by many of the same persons, and more importantly, Malkin Holdings supervises, or acts as agent for, ESB as well as ESB Associates.

Contractually, ESB Associates has no role in the day-to-day management of the Building, which is vested in ESB. As the Supervisor of ESB Associates, Malkin Holdings' duties *vis-à-vis* the Building are limited to physically inspecting the Building, monitoring compliance with the

---

[16]    It is not clear which particular breach ESB Associates is alleged to have procured.

36

Master Lease and the Sublease, and collecting rent from ESB.  Malkin Holdings also provides

ESB Associates with services related to taxes, financial matters, securities compliance,

insurance, and accounting/reporting activities, and related matters.  (*Form 10-K* at 10.)

In addition, ESB Associates has limited rights to perform the obligations of ESB under

the Sublease.  The Master Lease permits the lessor, following a default by the lessee, to pay any

imposition payable by the lessee under Article 3, take out, pay for or maintain any insurance

policy in accordance with Article 5 or make any other payment or perform any other act required

to be made or performed.  (*Master Lease* §6.01.)[17]  ESB essentially assumed the same

obligations and duties to ESB Associates under the Sublease that ESB Associates owes to the

lessor under the Master Lease.  Consequently, the Sublease permits ESB Associates to step in

and perform the same acts under the same limited circumstances that the master lessor is entitled

to do under the Master Lease.  (*See Malkin Affidavit*, Ex. A, at Art. 6.)

There is no evidence that ESB ever defaulted in the performance of its duties and

obligations under the Sublease, or that ESB Associates performed them in accordance with the

terms of the Sublease and the Master Lease.  In addition, Anthony Malkin has stated under oath

that (1) Malkin Holdings has not engaged in any activity on behalf of ESB Associates to direct

the operations of ESB or the Building, including ESB's relationships with the tenants in the

Building, and (2) has never caused ESB Associates to take any action with respect to the Skyline

Lease or License.  (*Malkin Affidavit* at ¶¶ 6-8.)  The *Form 10-K* confirms that ESB Associates

---

[17]     Relevant excerpts of the Master Lease are annexed as Exhibit E to the *Reply Affidavit of Rosemary Halligan*, sworn to September 16, 2011 (ECF Doc. # 69).

does not operate the Building, (*Form 10-K* at 3), and that ESB has assumed the responsibility for the maintenance, operation and management of the property.  (*Id.* at 10.)

Skyline does not point to any contrary evidence.  Instead, it contends that Malkin Holdings wears several hats, and "the record does not unequivocally support [the] conclusion" that ESB Associates has no authority to direct the operations of ESBC and plays no role in directing the operations of ESBC.  (*Skyline Opposition* at 38.)  As noted, however, the record amply supports the conclusion that ESB Associates lacks the contractual authority to oversee the day-to-day operations of the Building.  Furthermore, while it is true that Malkin Holdings is the agent for both ESB Associates and ESB, the wrongful actions that Skyline attributes to Malkin Holdings are consistent with its management of the Building as agent for ESB and not as agent for ESB Associates.  Finally, in its litigation with the City, Skyline contended that the Malkin family, acting through ESB and ESBI—not ESB Associates—was seeking "to destroy Skyline's business and expel it from the building."  (*Leeb Affidavit* at ¶ 12.)

At bottom, Skyline's opposition comes down to the proposition that Malkin Holdings did not identify its principal before it performed an act at the Building and the evidence *might* show at trial that it acted for ESB Associates when it participated in the wrongful conduct at the center of Skyline's claims.  This is not sufficient to create a factual issue in light of the clear and unambiguous documentary and testimonial evidence that when Malkin Holdings manages the day-to-day operations of the Building, including those pertaining to Skyline, it acts solely as ESB's agent.

Accordingly, ESB Associates is entitled to partial summary judgment dismissing the Eighteenth Claim for Relief, and it is unnecessary to consider the other grounds for dismissal asserted by ESB Associates.

In summary, the Motion is granted in part as to Count XI in the ESB Complaint and as to the Fourteenth, Fifteenth and Eighteenth Claims for Relief in the Skyline Complaint, and is otherwise denied.  The Court will schedule a trial on no less than 72-hours' notice.  Settle order.

Dated: New York, New York
      May 11, 2012

                             /s/ *Stuart M. Bernstein*
                              STUART M. BERNSTEIN
                    United States Bankruptcy Judge